FAHEY et al. v. O'MELVENY & MYERS et al.

FEDERAL HOME LOAN BANK OF SAN FRANCISCO v. O'MELVENY & MYERS et al.

No. 12591.

United States Court of Appeals Ninth Circuit.

Nov. 6, 1952.

Rehearing Denied Dec. 17, 1952.

Holmes Baldridge, Asst. Atty. Gen., Edward H. Hickey, Donald B. MacGuineas, Attys. Dept. of Justice, Washington, D. C., Verne Dusenbery, Portland, Or., Philip H. Angell, San Francisco, Cal., and Sylvester Hoffmann, Los Angeles, Cal. (Mose Silverman, Washington, D. C., Robert M. Adams, Jr., San Francisco, Cal., of counsel), for appellants.

Richard Fitzpatrick in pro. per.

Louis W. Myers, Paul Fussell, John Whyte and Pierce Works, Los Angeles, Cal., for appellees O'Melveny & Myers and Richard Fitzpatrick.

W. I. Gilbert, Jr., Los Angeles, Cal., for appellee W. I. Gilbert, Jr.

Charles K. Chapman, Long Beach, Cal., for appellee Long Beach Fed. Savings & Loan.

Westover & Smith, Los Angeles, Cal., for appellees Mallonee and others.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

## I

The essential issues presented on this appeal primarily involve and concern the status and operations of Federal Home Loan Banks. The instant appeal is from one of the many orders made by the lower court in proceedings in the so-called "consolidated cases" ("Mallonee Case" and the "Los Angeles Action") described in our opinion in Case No. 12,511, 196 F.2d 336, entitled "Home Loan Bank Board et al. v. Mallonee et al., *and* consolidated case Federal Home Loan Bank of San Francisco, et al. v. Federal Home Loan Bank of Los Angeles, et al." For convenience we shall hereafter refer to the entensive litigation embraced in these consolidated cases as the "main case," and for a better understanding of the facts and issues involved in this appeal reference should be had to our opinion in the main case. Many important contentions advanced on this appeal were relied on by the same parties in that case and they have stipulated that portions of the printed record in appeal No. 12,511 should be available for reference and utilization in this case. We approved this procedure.

A frequent reference will be made herein to "the Board" or "Board." As indicated in footnote 3 to our opinion in the main case, 196 F.2d 342, the composition and official status of the administrative authority or agency having supervisory control over the operations of Federal Home Loan Banks under the Federal Home Loan Bank Act, Chapter 11, Title 12 U.S.C.A., underwent the various changes there noted. Our use of the terms "Board" or "the Board" is a reference to this central administrative agency or authority and includes (when suggested in context) the former Home Loan Bank "Administration" referred to in our opinion in case No. 12,511. The term "association" or "associations" is a reference to any Federal Savings and Loan Association other than the "Long Beach Federal Savings and Loan Association" (a litigant in the main case) the latter being referred to herein as "Association."

A reference to three Board orders here in controversy means the three reorganization orders issued by the Board (then "Administration") on March 29, 1946, these being numbered 5082, 5083 and 5084. See footnote 5 in our main case opinion for text of the orders. 196 F.2d 343. The former Federal Home Loan Bank of Los Angeles was abolished by these Orders which merged it (along with the Federal Home Loan Bank of Portland) into the Federal Home Loan Bank of San Francisco. The former Federal Home Loan Bank of Los Angeles will be variously referred to by that title or as "Los Angeles Bank," or "Los Angeles." "Los Angeles Action" means the action instituted in the main case

426

by the Federal Home Loan Bank of Los Angeles and six "association" co-plaintiffs. It was there consolidated with the so-called "Mallonee Case."

The Federal Home Loan Bank of San Francisco will be referred to by that title or simply as "San Francisco." Where necessary or desirable, the Federal Home Loan Bank of Portland will be referred to by that title, or as "Portland," or the "Portland Bank."

The highly involved controversy described in our opinion in the main case appears to be without a counterpart in the books and by reason of entire absence of case law authority which directly deals with and/or directly passes on issues here presented which involve the problem of administrative supervision of Federal Home Loan Banks, we must and do conclude that the final and conclusive answer to many important contentions of the parties before us must necessarily be found in the clear and unambiguous terms of the Federal Home Loan Bank Act. Allied legislation touching the operations of associations under the Home Owners' Loan Act of 1933, as amended, 12 U.S.C.A. § 1461 et seq., is also involved. Where any issues raised in the main case legitimately come within the orbit of the instant appeal we will treat them as proper factors for consideration and comment.

The Basis of This Appeal.

The order which is the subject of the instant appeal directed the payment of "interim attorneys' fees" to appellees from certain funds which had been impounded in the registry of the lower court by an order made during proceedings in the main case. Which of the various litigants in that case owned these funds, and/or had right

to possession of the whole or any part thereof, was a controversy confronting the lower court, and the impounding order here involved placed these funds and assets in the registry of the court pending final adjudication of the merits of the various claims. At a later point we discuss their source and nature.

The order on appeal originated in the manner we now indicate. It was entered on June 19, 1950 in the main case and was issued pursuant to motions filed in that case in January 1949 and February 1950 by the co-plaintiffs in the so-called "Los Angeles Action." Appellees were and are counsel for the former Federal Home Loan Bank of Los Angeles and one of its six association co-plaintiffs (Wilmington) and the motion was based on the grounds that this former bank had no funds with which to pay its attorneys for services in that case "since all of its assets are in the possession of Federal Home Loan Bank of Portland, sometimes known and referred to as a Federal Home Loan Bank of San Francisco,"[1] *and* that the associated plaintiffs (plaintiffs in the so-called "Los Angeles action") "have a beneficial interest in the assets of Los Angeles Bank *now in possession of said defendant Federal Home Loan Bank of Portland* sufficient to entitle them, and each of them, to the payment *out of said assets* of the fees of their attorneys." (Emphasis supplied.)

The order directed the clerk of the lower court to pay from and out of these impounded funds the sum of $67,500 to appellees who were counsel for Los Angeles, for services theretofore rendered in the so-called "Los Angeles action"; and to pay the sum of $7,500 to counsel for Wilmington Association (a co-plaintiff in said ac-

1. Created by above noted Federal Home Loan Bank Administration Orders 5082, 5083, 5084 of March 29, 1946.

For text of order on appeal with accompanying findings of fact and conclusions of law, see pp. 288 to 312 of printed transcript on this appeal. For text of motion of Los Angeles Bank in the "Los Angeles Action" for order directing payment of attorneys' fees on account (with

accompanying documents in support of the motion) see pp. 5698 to 5754 of printed transcript in appeal in the main case, No. 12,511. For text of motion of First Federal Savings and Loan Association of Wilmington (a co-plaintiff in the Los Angeles Action) for allowance of attorneys' fees in that class action, see pp. 8909 to 8920 of printed transcript in the main case.

tion) for services theretofore rendered in the "consolidated actions." [2] The court described the allowance as "an interim allowance on account only" and the formal order provided that the payment be made "out of funds and moneys heretofore deposited and now on deposit in the Registry of the Court in the above entitled consolidated actions" *and* that "the amounts ordered hereby paid generally from the funds in the Registry of the Court are not by the terms of this Order, imposed, allocated or assessed upon or against any specific party or parties, fund or funds, provided, however, that it is hereby determined and ordered that the amounts, or any part thereof, herein allowed and ordered paid from said funds shall never be allocated against or imposed upon funds or assets owned by or belonging to the Long Beach Federal Savings and Loan Association, (Association) or any of its shareholders, members or stockholders, either individually, or as an association, except as such association shall be required to bear as a member-shareholder only of a Federal Home Loan Bank. The intention being that the services for which fees are herein allowed are primarily for the benefit of said Los Angeles Bank and its associa-

tion member-shareholders as distinguished from the Long Beach Association and other parties as separate entities or parties."

The order further provided "that Long Beach Association [3] shall not at any time be required to deposit any additional money or property in Court in these consolidated actions upon or because of the payment of all or any portion of the sums herein ordered and directed to be paid."

It will be noted that the foregoing motion of Los Angeles refers to "assets of Los Angeles Bank now in possession of said defendant Federal Home Loan Bank of Portland." As indicated above, "Portland" and "Los Angeles" banks were merged into the Federal Home Loan Bank of San Francisco.

Other appeals now pending in this court also involve these impounded funds which suggests the necessity of identifying their source and nature. The record indicates, and stress is given the fact that this fund arose out of five "interpleader or intervention proceedings" in the so-called "Mallonee Case," supra, (which was consolidated with the "Los Angeles Action" in the main case) each of which interpleader proceedings was based on the presumption that

2. The amount of the fees awarded by the court and the rendition of the services by appellees are not questioned by appellants on this particular appeal. As to this appeal the issue is therefore confined to the *authority* of the court (under all of the circumstances here revealed) to award such fees and direct payment from the impounded assets. Aside from showing by affidavits appellees relied on the testimony of Judge Morrow, a prominent attorney of Los Angeles with a legal experience reaching back to 1902. He testified that the services of counsel for the Los Angeles Bank and its co-plaintiffs in the main case were worth $175,000 for services rendered by them up to June 30, 1949 and based his appraisal on several pertinent factors. He described the litigation as "extremely complicated and unique" and stated that he would be justified in applying other superlatives in describing it; that in all of his experience he had never seen anything like it and could not think of any more difficult, complicated or unique litigation; the "only worse thing from being a lawyer in this case would be

the judge of this court, and I am sorry for you"; that he agreed with the court that this litigation "would tax to the highest degree anybody's legal ingenuity to meet the legal problems presented in the case."

A sidelight on the allowance of fees in this litigation appears in the appeal record. At one time the lower court indicated an intention to allow $540,000 as a payment on account of attorneys' fees. Counsel for one of the parties in the main case stated in argument in the lower court that up to April 8, 1950, the court had actually allowed counsel fees in the neighborhood of $300,000, the exact amount being in doubt. This amount included fees allowed to a special master.

3. Long Beach Association here referred to is the Long Beach Federal Savings and Loan Association of Long Beach, California, an active party litigant in the main case. In our opinion in case No. 12,511 it is referred to as "Association." On this appeal it filed a brief in which it states that the Los Angeles Bank had 172 stockholder associations, owning $5,971,500 of its voting capital stock.

the 1946 order of the Federal Home Loan Bank Administration appointing Ammann as Conservator of the Long Beach Federal Savings and Loan Association *was void ab initio*, and that *every act* performed by Ammann in the management of the said Association was a nullity and therefore subject to collateral attack. These interpleader and/or intervention proceedings in the main case which we describe at this point were instituted by Title Service Company, Robert H. Wallis, Home Investment Company, George Turner and the Long Beach Federal Savings and Loan Association. *All were parties in and to the so-called Mallonee case.* Home Investment Company intervened on July 1, 1946 to secure an order quieting title and to secure reconveyance of 174 deeds of trust which had previously been interpleaded by Title Service Company in its answer and cross-claim in interpleader and which deeds had been deposited in court. Home Investment Company does not appear to be a claimant to the funds here considered.

As to the intervening and interpleading parties mentioned in the preceding paragraph see our opinion in the main case, 196 F.2d 336, 378, 379, wherein we held that the five original actions or proceedings instituted by the there identified Mallonee-Association group and Wallis and Home Investment Company should have been dismissed by the lower court for the reason that they failed to state a claim upon which the relief they demanded could be granted and for the further reason that Association had failed to exhaust tendered and available administrative remedies.

Title Service Company (a John Doe defendant in the Mallonee case) filed so-called cross-claims in interpleader in that action in which it alleged that it was trustee under some 8,000 trust deeds securing loans made by the Association with a remaining balance of over $12,000,000; that it was faced with a demand of the Conservator that it make reconveyances of title to borrowers on repayment of loans secured by the trust deeds while the Association was demanding that it not make such reconveyances. It asked the lower court to adjudicate the "rights" of these adverse claim-

ants. In this posture of the controversy the court thereafter required borrowers desiring to obtain reconveyances of title on final repayment of their loans, to *intervene* in the Mallonee action and to deposit their final payment in the registry of the court. The court also ordered the Conservator to deposit in court all sums paid by these borrower interveners during the Conservatorship, after which the court ordered delivery of the reconveyances. In proceedings in the Mallonee case $1,641,037.96 of Association funds were thus drawn into the registry of the court.

In his "cross-claim in interpleader" Wallis, a John Doe defendant in the Mallonee case, deposited an unendorsed cashier's check for $50,000 payable to himself—a check delivered to him by Association to be used to pay his legal fees, etc., in litigation in connection with the troubles of Association described in our opinion in the main case. He prayed that the court "instruct" him as to his "rights and duties" in the face of conflicting demands upon him by Association and the Conservator as to "the use of the check."

After the termination of the Conservatorship over Association, Turner, a John Doe defendant in the Mallonee case [196 F.2d 349], filed a so-called "cross-claim in interpleader" alleging certain undefined conflicting claims to rentals due from him under a lease of real property from Association. He deposited in the registry of the court the sum of $11,515.87 (the amount then alleged to be due). From time to time he deposited additional rentals as they became due and at the date of the order here appealed from, the amount of rentals so "interpleaded" and drawn into the registry of the court was $18,503.52.

In April 1949, Association, claiming conflicting demands by the "Federal Savings and Loan Insurance Corporation", see subchapter IV, Title 12 U.S.C.A. § 1724 et seq., on the one hand and Association shareholders (Mallonee group) on the other, was permitted by the court to *interplead* in the Mallonee case and deposit in the registry of the court the sum of $24,374.06 being the amount of insurance premiums claimed by the said insurance corporation, which was

required by statute to insure the accounts of Association. See 12 U.S.C.A. § 1726(a). As succeeding installments of insurance premiums fell due, Association filed "supplemental interpleaders" in the Mallonee case in connection with which proceedings these "installments" were deposited in court. At the date of the order here on appeal the amount of insurance premiums so "interpleaded" and deposited in the registry of the court was $55,485.25.

In May 1946, Association, acting through its (then) Conservator (Ammann) *borrowed* from the Federal Home Loan Bank of San Francisco the sum of $7,300,000 (later paid down to $6,300,000) and pledged as security for this loan some $12,000,000 of its notes and trust deeds *and* $5,300,000 face value of government bonds. On Motion of Association in the Mallonee case the court, on March 13, 1948, entered an order requiring the Federal Home Loan Bank of San Francisco to deposit in the registry of the court the *notes* of Association evidencing the $6,300,000 loan together with the United States bonds in the sum of $5,300,-000 and the notes *and* trust deeds which had been pledged as collateral. On motion of Association, the lower court, on March 26, 1948, entered an order releasing to Association *the said notes and trust deeds* then amounting to more than $8,000,000 and "lifted" the then lien of the Bank of San Francisco thereon, and *transferred* this lien to so much of the funds then in the registry of the court (under the borrower-intervener proceedings) as would make the difference between $5,300,000 (the face value of the deposited bonds) *and* $6,324,098.35 (the amount of principal and interest due as of March 10, 1948 on Association's *notes* to the Bank of San Francisco) plus interest on $6,300,000 from March 10, 1948 until paid.

So much by way of specific identification of the interpleader-intervention proceedings and the impounded funds. It should again be emphasized that the question as to the *validity* of the original appointment of Ammann as Conservator of Association underlies, explains the existence of, and gives decisive character to much of the controversy over the impounded funds.

A vigorous dispute and controversy arose among the parties to the main case concerning the legal ownership of, or possessory and/or lien rights, in, the said impounded funds, and their contentions are illuminating. During argument of counsel in April, 1950, preliminary to formulating the order here on appeal, counsel for Association made plain to the lower court that it was claiming *all* of the impounded funds and assets *and* that its claim extended to a *cancellation of its note* held by the Bank of San Francisco. Association also demanded a return of *all* of the bonds which had been deposited as security with the Bank of San Francisco.

Counsel for appellant Bank of San Francisco pointed out to the court that all it had in its possession were the notes executed by Conservator Ammann which Association claims are *void* because the appointment of Ammann as Conservator of Association was invalid. (It appears that four notes of Association are involved.) See further contentions set forth in footnote 4, infra.

A part of the colloquy in open court here set out sheds much light on this important issue in both this and the main case. (Emphasis supplied by us.)

The Court: "So far as the Long Beach Association is concerned, it is claiming that it owes neither the San Francisco Bank *nor* the Los Angeles Bank any money."

Counsel for Association: "That is right."

The Court: "That it is entitled not only to *all* of the [impounded] funds in court but also to a cancellation of the note [given by the Conservator of Association (Ammann) to the Bank of San Francisco]"

Counsel for Association: "That is right."

The Court: "And the return of all of the *bonds* which are deposited [with Bank of San Francisco] as security. And if that did ultimately occur, *then* there would be no funds [impounded] in court except the Long Beach Association's. Is that not your basis of objection"?

Counsel for Bank of San Francisco: "That is one hundred per cent correct. All we have is the notes, which are claimed by the Association to be void *because* Ammann had no authority [when acting as Conservator of Association] to make them, and if that be true and the *Association ultimately prevails on that,* then the security securing these notes *falls with the void notes.*"

The record at this point does not show that counsel for the contending parties rejected the implications of the contention here raised by counsel for Association; furthermore all parties agreed that they wanted "a final [appealable] judgment" on the issue of payment of appellees' fees from the impounded funds.

Counsel for the Bank of San Francisco added this statement to the court:

"I think who owns them [the impounded funds] is as clear as anything can be, that is, that Long Beach [Association] owns them. I never, never knew of any person who had anything put up for security that didn't own it. All the other fellow had was a security in it."

Counsel was here apparently conceding that Association owned the impounded assets *but* was insisting that Association still remained lawfully indebted to the Bank of San Francisco on its several notes security for payment of which *was some portion of the impounded funds.*

At another point occurred the following exchange:

"The Court: (addressing counsel for Bank of San Francisco) "You just asserted a claim to $6,000,000, in bonds and $1,000,000 in cash."

Counsel for Bank of San Francisco: "We do, your Honor. The bonds in this impound we claim to have a lien on them. We recognize the general property ownership in that collateral belonging to the Long Beach Association. We have them as pledgees as security for our notes."

Counsel for Long Beach Association: "This lien that they claim they

have got from Ammann. I don't think they got anything."

(This contention of Association is of course also a challenge to the validity of the appointment of Ammann as Conservator.)

That the various claims affecting rights in the impounded funds were creating a confusing pattern is evidenced by another extract from the colloquy before the court. Referring to the claims of appellees for interim attorneys' fees to be paid from the impounded funds the court said:

"*They* [appellees] are not saying that they want attorney fees from the defendant [Bank of San Francisco]; they say they want attorney fees *from their own money* which the defendant [Bank of San Francisco] has got and money to which they lay claim and title and this court has jurisdiction in personam over the defendant to compel him to disgorge what belongs to them. Is that your theory?" (The "them" here referred to was of course the former Bank of Los Angeles.)

Counsel for appellees: "That's it exactly, your Honor."

The record in the main case sheds further light on the impounded funds. In a supplemental cross-claim filed by Association on May 28, 1948, it alleged that in making the advancements of said $6,300,-000 to Ammann as purported Conservator for Association, San Francisco Bank and other cross-defendants "were using wholly or in part, money, funds, and assets, which they knew were owned by, the property of, and belonging to the Federal Home Loan Bank of Los Angeles [or belonging to its stockholders] which said money, funds and assets have been acquired by the cross-defendants by fraudulent and malicious *seizure and confiscation of said Los Angeles Bank * * *.*"

Further light is shed on the various claims by an argument of counsel for Los Angeles made in court in the main case on July 30, 1948. He stated:

"We [Los Angeles Bank] are asserting claims to the $6,300,000 worth of notes on deposit in the registry of

the court, executed by Ammann as Conservator, and it is our claim that the funds used to make these loans, in large part, *were funds of the Los Angeles Bank.*"

This frank avowal leaves no doubt as to the position of Los Angeles.

In an answer of the Bank of San Francisco (in the main case) to the amended cross-claim of Association which answer was filed July 30, 1948 San Francisco describes the loan made to Association in the following manner. It asserted that during the period while Ammann was in charge of Association as Conservator, Association borrowed from the Bank of San Francisco sums exceeding $6,300,000 which sums were at all times secured as required under the provisions of the Federal Home Loan Bank Act and rules and regulations adopted pursuant thereto, by the assignment and pledge of United States Government Bonds, promissory notes secured by mortgages or deeds of trust on real property, and stock held by said Association in said Bank of San Francisco. That all said sums so borrowed by Association were used by Association in transacting and operating the business of Association and for purposes and to the benefit of the business of Association. San Francisco further averred that no payment of said indebtedness has ever been tendered to the said Bank of San Francisco and no demand for surrender of said collateral or any part thereof has even been made by Association and no attempt has ever been made by Association to effect a redemption of said collateral by payment of said indebtedness.

As the record indicates, the conflicting contentions respecting the impounded funds make a confusing picture. Because of the importance which all parties attach to these funds we have given them more elaborate treatment in the margin.[4]

4. More of the colloquy in open court is enlightening. In arguments concerning the right of the lower court to order payment of fees to counsel for Los Angeles out of the impounded funds counsel for Association made reference to "four notes" these being the notes of Association given to the Bank of San Francisco to evidence that bank's loan to Association which had been negotiated by the Conservator (Ammann) when he was in charge of the affairs of Association. They covered the loan of $6,300,000 to which we have referred in the body of this opinion. In argument, counsel for Association asserted that these four notes were "created" by the Bank of San Francisco *taking the seized assets of the Bank of Los Angeles and lending them to Ammann.*

Counsel for Association further argued that "All that there was in the San Francisco Bank was the $46,000,000 they seized on the 29th of March, [under the three 1946 Home Loan Bank reorganization orders of the Board bearing that date] from the Los Angeles Bank *and* the $9,000,000 of the Portland [Bank] assets that they mixed up with it. Out of that they loaned $7,300,000 less than seven weeks later and *that* is the assets that went into those four notes. We [Association] deny any liability on those notes and your final judgment may well say that we don't owe anything on those notes."

And further from counsel for Association: "I don't know how the litigation will come out, but certainly these applying stockholders [plaintiffs in the Los Angeles Action] are going to represent the class of either Los Angeles Bank stockholders, San Francisco Bank stockholders or Portland Bank stockholders, and *that* is all the classes there can be, and they are the real owners of the assets represented by the $6,300,000 in court."

Counsel for *appellants* pointed out that "collateral security" for the payment of the notes held by the Bank of San Francisco was represented by the impounded assets created by the interpleader proceedings, these funds being $6,300,000 of notes, $5,300,000 of bonds and $1,000,000 odd cash; that the Bank of San Francisco claimed a *lien* on the bonds in this impound while recognizing the general property ownership in that collateral belonging to Association. "We have them [bonds] as pledgees as security for our notes." (As noted above counsel for Association rejected the contention of the Bank of San Francisco that it had a "lien" on the bonds in the impound, this because Conservator Ammann was without lawful authority to make the notes for and in the name of Association.) See Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030, as to validity of appointment of Ammann as Conservator of Association.

Before concluding this part of our opinion reference should be made to the views expressed by the Supreme Court in Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030, concerning matters which bear directly on the issue of the validity

In connection with the matters and things referred to in this note we point out that the lower court had formally found that since March 29, 1946, the Los Angeles Bank "has been without property or assets with which to employ counsel."

On this appeal the appellees have advanced certain reasons in support of the award to them by the court, and these reasons shed additional light on the problem. (*Emphasis is ours.*)

Wilmington (association co-plaintiff in Los Angeles Action) urges that the Bank of San Francisco has "used funds of the Los Angeles Bank in the sum of $100,-000, and perhaps more" in resisting the steps of the various plaintiffs in the main action; that in so doing the Bank of San Francisco has made "inroads" upon assets that "may well turn out to be assets of the Los Angeles Bank"; that the court is not powerless "to equalize" this situation by "making it possible for the Los Angeles Bank and the associations who sue as a class for the stockholders, to obtain funds for presenting their side of the case";—that otherwise the persons who seized these funds under the three orders of March 29, 1946 would by such seizure be able to deprive the persons to whom the Los Angeles Bank assets rightfully belong of the ability to secure adequate representations to present their case. Therefore the court "has inherent power and right" to permit "equal access" to the disputed fund at the various stages of success in the battle. By way of summary, Wilmington argues that it participated in litigation "*which resulted in the deposit in Court of large sums of money belonging to the Los Angeles Bank.*"

Counsel for the attorneys of the Bank of Los Angeles insist in their brief that the Bank of San Francisco *does have money in the registry* and therefore it would be no worse off than if the court ordered that bank to pay counsel for Los Angeles Bank out of funds of the Los Angeles Bank which the Bank of San Francisco "took over" under the orders of March 29, 1946. In short, "the matter is merely one of bookkeeping." They further assert that the San Francisco Bank *is herein precisely the same position* as was the Building and Loan Commissioner in the Eggert fee appeal, Eggert v. Pacific States Savings & Loan Co., 53 Cal.App.2d 554, 127 P.2d 999. The San Francisco Bank was sued,

served and appeared below strictly in personam and the court has jurisdiction to order payment either out of Los Angeles derived funds in its hands generally, or out of their equivalent heretofore deposited by the San Francisco Bank in the registry. Therefore San Francisco Bank is in no better position to complain in the one case than in the other.

The answering arguments of appellants are lengthy and involved and require summary in part. Generally stated they are that the necessary effect of the provisions of the award order *is* to impose payment upon the Bank of San Francisco *and* Federal Savings and Loan Insurance Corporation; that there are no *general funds* on deposit in Court; that *all of the funds were* deposited in purported interventions and interpleaders as to each of which several separate and distinct claims are asserted; that *all* of the funds in the registry of the court were created in proceedings in the Mallonee case and relate to the business and affairs of Association; that *none* of the legal services described in the award order appealed from were performed in connection with *any* of the interpleaders or interventions in which the deposits were made; that in *none* of the proceedings which resulted in the deposits in court has the Los Angeles Bank asserted any claim for attorneys' fees.

Appellants further urge that neither the Los Angeles Bank nor its co-plaintiff shareholders members (associations in the Los Angeles Action) are entitled to recover their attorneys' fees from any of the above described deposits since such payments could not be made without an unlawful invasion of the property rights of others who could not on any theory known to the law be held liable for payment of these attorneys' fees. It is also urged that as a matter of law a "dispute" exists as to the validity of claims involving rights to the possession of a large segment of the funds impounded in the court, this being illustrated by the claimed lien of the Bank of San Francisco on the impounded funds for payment of the notes of Association held by it—this fact in itself giving rise to a valid "dispute."

Appellants boil down their general contentions into more specific form. These are herewith summarized:

(1) The order is unique—it is not a judgment directing the Bank of San Francisco to pay the amount of attor-

of the notes held by the Home Loan Bank of San Francisco. A formal holding of the Court was that the shareholders of As-sociation (Mallonee) were estopped, *as the Association would be,* from challenging the provisions of the Act, Home Owners' Loan

neys' fees allowed but directs payment "generally" from the funds, reserving for future determination the "fixing, allowance, allocation, assessment, or apportionment of attorneys' fees * * * for or against any of the parties (but never against Association or any of its shareholder members (Mallonee group))."

(2) The necessary effect of the devious provisions of the order is to impose payment of the attorneys' fees upon the appellants and particularly upon the Bank of San Francisco *and* Federal Savings and Loan Insurance Corporation.

(3) That the deposits by Title Service Company of the notes and deeds of trust were made in alleged interpleader proceedings where Association and Ammann were adverse claimants.

(4) That more than $1,500,000 was paid into the registry of the court by various debtors of Association in connection with approximately fifty separate intervention proceedings to clear title to approximately 400 properties, this because Association refused to accept payment or to direct the trustee to reconvey and denied the right of Conservator Ammann to do so on the ground that his appointment as Conservator was invalid. These funds clearly belong to Association.

(5) The Wallis check of $50,000 was deposited in a proceeding alleged to be in the nature of an interpleader, in which plaintiff Wallis alleged that Association and Ammann were adverse claimants. This check belongs either to Wallis **or** Association and no claim is made that **it** belongs to anyone else.

(6) The only possible claimants to the funds deposited in a proceeding alleged to be in the nature of an interpleader which involve the disputed insurance premiums claimed by the Federal Savings and Loan Insurance Corporation to be due and owing from Association would be Association *and* the Insurance Corporation.

(7) The Turner funds were deposited in a so-called interpleader proceeding where Turner alleged that Association was the only adverse claimant. Turner disclaims any interest in this money.

Appellant asserts that upon these facts neither the Los Angeles Bank nor its shareholder association members, (including Wilmington) are entitled to recover their attorneys' fees from *any* of the above described funds. This leaves for

consideration only the deposit of four promissory *notes* in the principal sum of $6,300,000 executed on behalf of Association by Conservator Ammann in favor of the Bank of San Francisco to evidence a loan of money made by the Bank to Association through its Conservator, *together with* collateral security for the repayment of the four notes. These were deposited under order of the court dated March 13, 1948. The collateral initially deposited consisted of United States Government Bonds of the face value of $5,300,000 *and* promissory notes and deeds of trust originally pledged to the Bank of San Francisco. The notes and deeds of trust were subsequently returned to Association, and cash in excess of $1,000,000 then on deposit in court as a result of proceedings described above in paragraph (4) was by order of the court declared to be "substituted collateral." The proceeding in which said deposit was made is alleged to be in the nature of interpleader in which Association is the plaintiff claiming all of the property impleaded, and the Bank of Los Angeles and the Bank of San Francisco are alleged to be the defendants in interpleader and the adverse claimants to said notes and collateral. The claim of Los Angeles is for an award of fees for its counsel *out of this fund,* and this claim is predicated upon the alleged *invalidity* of Order 5082 which transferred its assets to the San Francisco Bank; that Los Angeles is entitled to trace *these* assets through the Bank of San Francisco *into* the funds in the registry of the court. Association at the same time claims that it is entitled to the same notes and collateral *because* they were given to the Bank of San Francisco by Ammann who was without authority to serve as Conservator in that the order appointing him was *invalid.* Association also asserts that *if* the notes are valid obligations of Association, it is in doubt as to which bank is its creditor, thus raising the issue of the validity of Orders 5082, 5083, 5084, which reorganized the Home Loan Bank set-up on the Pacific Coast. This entire interpleader proceeding involving the notes and security therefor is thus clearly an impermissible collateral attack based solely on an unallowable presumption of the invalidity of four administrative orders, and as such the so-called interpleader proceedings involving this particular deposit cannot be maintained. Citing

Act of 1933, which authorized the Board to prescribe the terms and conditions under which a conservator may be named, 332 U.S. at page 256, 67 S.Ct. at page 1557. A final decision was that it was error to oust the conservator (Ammann) *or to enjoin any of his proceedings,* or to enjoin the administrative hearing on his appointment. 332 U.S. at page 257, 67 S.Ct. at page 1557. It was during his tenure as conservator of Association that Ammann negotiated loans from the Home Loan Bank of San Francisco to Association and for and on behalf of Association executed and delivered these notes to that bank to evidence the loans. The claimed lien of San Francisco on the impounded funds is based on these notes.

For a detailed record of the proceedings in the lower court leading up to the order impounding the funds, recourse should be had to the printed transcript of record on the appeal in the main case (12,511). The motion of Association for order of impound appears at pp. 3562 to 3597; the motion of Association for an order to San Francisco to show cause why funds should not be impounded appears at pp. 3597 to 3599; the order directed to San Francisco and Los Angeles requiring these banks to show cause why the motion of Association to impound the funds claimed by Association should not be granted, appears at pp. 3599 to 3601; the "Return" of San Francisco to the court's order to show cause appears at pp. 3690 to 3752; the "Return"

Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999.

Appellants *advance yet another contention.* They say that even if the interpleader proceedings, under Title 28 U.S. C.A. § 1655, could be maintained, the Los Angeles Bank and its (association) shareholders would not under any view of the law be entitled to payment of their attorneys' fees out of the funds impounded. The proceeding is not a true interpleader. By reason of the claim of Association to an interest in the impleaded property the proceeding is at most an action in the nature of interpleader—that where the proceeding is merely one "in the nature of interpleader" *and* the plaintiff is not a disinterested stakeholder but is himself a claimant or has a controversy with the claimant, not only is the impleading plaintiff not entitled to attorneys' fees (citing cases) but even the prevailing claimant cannot recover such fees from the fund impleaded or from the adverse party. Obviously a claimant in interpleader cannot recover from the impleaded fund attorneys' fees incurred in another action or proceeding. Law will not justify such an allowance particularly since the payment here proposed will invade the lien rights of the Bank of San Francisco and serve to reduce the funds held by the court which are security for the indebtedness due the Bank of San Francisco. Since there are no "general funds" in the registry of the court and Association is discharged of liability the effect of the order is to require payment of fees to the counsel for Los Angeles Bank out of funds previously by the Court's own order set aside as substituted collateral securing

the obligations owed to the Bank of San Francisco. The order further specifically insures that the resulting impairment of the collateral shall never be cured.

The arguments hereinbefore outlined, and the comments thereon, point up the presence, in this bewildering maze of cross-claims as to matters of law and fact, the asserted "lien" of the Bank of San Francisco upon the impounded funds in order to secure payment of the notes given by Association (through Conservator Ammann). It will be noted that the broad ownership claim of Los Angeles is also involved.

It may be that Association is the owner of the impounded funds but this would not extinguish the claim of lien asserted by Bank of San Francisco. In this regard, it cannot now be doubted that the appointment of Ammann as Conservator of Association was valid, in view of the decision of the Supreme Court in Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030. The loan, to secure the payment of which the four notes of Association were given to the Bank of San Francisco, was made during the valid conservatorship of Ammann. If the Federal Home Loan Bank of San Francisco was lawfully established by the Board, it necessarily follows that the lien of San Francisco (which arose from and was founded upon the notes of Association executed by Ammann) must be satisfied from and out of the impounded funds.

Our elaborate references to the impounded funds are justified by the fact that they are involved in all of the several appeals now pending in this court.

of Los Angeles to the court's order to show cause appears at pp. 3642 to 3646; the impounding order of the court, dated March 13, 1948, appears at pp. 8399 to 8525.

The above mentioned "Returns" of San Francisco and the accompanying affidavit, of Frank Noon set forth a detailed description of the conditions under which the loan was made by San Francisco to Association during the time Ammann was serving as Conservator of Association. The basis of the asserted "lien" of San Francisco on the impounded funds is clearly indicated in these documents. For further illuminating comments on this loan transaction by counsel for the Mallonee group see printed transcript in case 12,511, pages 6219 to 6225, and pages 6298 to 6301.

## II

Underlying practically all of the issues posed on this appeal is an impressive body of statute law and we are persuaded that many of the contentions which are asserted to be of not only vital, but controlling importance on this appeal must find sanction and support in this legislation, or be rejected. We refer to the "Federal Home Loan Bank Act", Title 12, Chapter 11, U. S.C.A. It is our view that this legislation represents a constitutional exercise of Congressional authority; that its unambiguous language expresses a clear and definite Congressional purpose and intent to preempt the entire field of banking activities embraced within the terms and provisions of this banking legislation and reserve to Congress the fullest measure of control over such activities. To accomplish the purpose or purposes expressed in this legislation our Congress saw fit to create its own administrative arm or agency (the Home Loan Bank Board) through which it could direct and control the administration of the provisions of the Home Loan Bank Act. To that end it vested in this Board wide power and authority to control the affairs and operation of banks in the Home Loan Bank System set up under the Home

Loan Bank Act. We consider it unnecessary to recite the powers of the Board—they are set out in great detail in the bank act, and their inclusion would unduly expand this opinion. Our ultimate conclusions as to their meaning and significance must serve our purpose. We have previously indicated that we adhere to the view that the Home Loan Bank Act which created the nationwide "Federal Home Loan Bank System" must control when its terms are applicable to fact situations revealed in the record. And as related legislation we may not overlook the here involved Federal Savings and Loan Insurance Corporation or the Home Owners Loan Act of 1933.[5] Where we deem it necessary we shall refer to any of the provisions of these legislative enactments.

One thing is abundantly clear in this case. Appellants and appellees are poles apart in their appraisal of the effect and controlling force and applicability of the sweeping terms of the Federal Home Loan Bank Act (and allied legislation) on the many issues present in this case. The sharp conflict of views is best exemplified by the formal contentions of the parties which we set out at this point. We think it necessary to fully expose them because we are convinced that the acid test of their validity must, in the last analysis, lie in the terms of the legislation just above noted.

### Appellants' Contentions

Appellants the Federal Home Loan Bank Board and its members, and the Federal Home Loan Bank of San Francisco assert that eight questions are presented for decision on this appeal and we summarize them as follows:

1. Whether the (three) orders of March 29, 1946 (see footnote 5 in opinion No. 12,-511) readjusting the Eleventh Federal Home Loan Bank District and dissolving the Los Angeles Bank invaded any legally protected private rights of the bank or its members so as to give them standing to sue.

2. Whether out-of-state service of process (in the main case) on the members of

---

5. Title 12, U.S.C.A. Subchapter IV, § 1724 et seq., creating the "Federal Savings and Loan Insurance Corporation."

"Home Owners' Loan Act of 1933", Title 12, chapter 12, U.S.C.A.

the Home Loan Board and other non-resident appellants under either Section 1655 or Section 2361 of Title 28 U.S.C.A. gives the court jurisdiction to invalidate the (three) orders of March 29, 1946.

3. Whether the allegations of the Los Angeles complaint that there was a failure to afford a (Board) hearing and make findings thereon or that the (three) orders were issued for improper motives give the court jurisdiction to review the (three) orders.

4. Whether the Los Angeles complaint in the main case fails to state a claim within the jurisdiction of the court either (a) because the action constitutes a collateral attack upon administrative orders; or (b) because the orders are valid until duly set aside in an appropriate proceeding.

5. Whether the consolidated actions (in the main case) insofar as they seek to invalidate the orders of March 29, 1946, constitute an unconsented suit against the United States.

6. Whether prior to trial and a determination of the merits of this action (the main case) claimed by plaintiffs to be *quasi in rem* and claimed by defendants to be in personam, the court is authorized to award attorneys' fees to plaintiffs' attorneys.

7. Whether in this action (the main case) to recover property, based upon the alleged invalidity of the (three) orders of March 29, 1946, the right and title to which property is in dispute between the plaintiffs and the defendants, the court is authorized to award attorneys' fees out of such property.

8. Whether the (impounded) deposits in court are unavailable for payment of the fees allowed to attorneys for the Los Angeles Bank and its plaintiff shareholders (a) because they do not constitute funds "created, preserved or protected" by the plaintiffs; or (b) because the proceedings as a result of which the deposits were made constitute an impermissible collateral attack upon administrative orders; or (c) because the attorneys' fees are not alleged to have been earned in any of the intervention or interpleader proceedings in which the deposits were made; or (d) because the order by its terms precludes payment out of any funds

of Long Beach Association, and there are no other funds available for such payment.

Appellants urge that in disposing of the foregoing questions the lower court erred in six particulars, as follows:

1. In determining that it had or has jurisdiction of the "consolidated actions" No. 5678 and 5421, (the Los Angeles Action and the Mallonee Case in the main case) or either of them, and its Findings of Fact and Conclusions of Law to that effect are erroneous.

2. In determining that it had jurisdiction in the consolidated actions over the persons of the Home Loan Bank Board, John H. Fahey, individually and as a Federal Home Loan Bank Commissioner, and Federal Savings and Loan Insurance Corporation, either

(a) on the ground that the actions are brought under 28 U.S.C.A. § 1655, or

(b) by reason of the various subjoined and subsidiary interpleader or intervention proceedings, or

(c) by reason of any general appearance having been made on behalf of said parties, or

(d) by virtue of determination by the District Court in previous orders entered in the consolidated actions that it has jurisdiction, and its findings of fact and conclusions of law to the contrary are erroneous.

3. In determining that the legal services rendered by appellees O'Melveny & Myers, Richard Fitzpatrick, and W. I. Gilbert, Jr. (in the main case) have inured to the benefit of their respective clients (Bank of Los Angeles and Wilmington Association) so that they are now compensable, and Findings of Fact No. 14, 15, 16, 17, 18 and 21 are erroneous. (These Findings accompany the order on appeal.)

4. In determining that O'Melveny & Myers, Richard Fitzpatrick, and W. I. Gilbert, Jr., are entitled to recover attorneys' fees upon their motion therefor and in fixing the amount of such fees.

5. In directing payment of such attorneys' fees out of funds and monies on deposit in the registry of the court in the consolidated actions; and the court especially

erred in directing payment generally out of funds in the registry of the court without designating the particular fund or funds from which the payment should be made, or the party or parties upon whom the burden of payment is to rest.

6. In exempting Long Beach Association and its property from the burden of contributing to the payment of said judgment while adjudicating that all other parties to the litigation and all other claimants to the funds on deposit in the registry of the court are potentially liable for the payment of the same as may be determined in subsequent adversary proceedings which the court reserves power to conduct.

Appellants boil down the foregoing arguments to three basic contentions which typify their case and if these postulates are sound in law the order on appeal must be reversed. They are based on the broad premise that the order may not stand primarily because the lower court was without jurisdiction of the so-called "Los Angeles Action" in connection with which the award was made, as well as because of the absence of any *legal basis* upon which the award could be made. Summarized, (with our emphasis supplied) these three contentions are:

A

The Los Angeles Action does not present a claim within the jurisdiction of the district court. Neither the Los Angeles Bank nor its shareholder plaintiffs (co-plaintiffs in the Los Angeles Action) had *any justiciable right* which could be adjudicated by a Federal Court. The shareholders had no standing to sue (in the main case) because none of their *legally protected rights* was invaded by the (three) orders of March 29, 1946, which readjusted the Eleventh and Twelfth Federal Home Loan Bank Districts and consolidated the Los Angeles and Portland Banks. The Los Angeles Bank had no standing to sue because, *being an instrumentality of the United States performing solely governmental functions,* it had no justiciable right to the continuance of its existence.

Further, the administrative action complained of is not subject to judicial review *because it was the exercise of legislative authority properly delegated to the Board and involved determinations which the Act provided could be made only by the Board.* This is not altered by the fact that the orders complained of were issued without notice, hearing or formal findings. The statute does not require such hearing or findings and there exists no constitutional right of the plaintiffs to such hearing.

The Home Loan Bank Board and its members are indispensable parties to the maintenance of the Los Angeles Action because no effective relief could be granted *without compelling action by the Board. Valid service upon the Board and its members has not been had.* Finally, the action is an unconsented suit against the United States because it seeks to compel official action by the Home Loan Bank Board, a branch of the Executive Department of the Government.

B

The order awarding attorneys' fees cannot be sustained for the reason that it does not fall within any of the limited exceptions to the general rule that plaintiffs may not recover attorneys' fees from other parties to the litigation. *This is not* a case where a fiduciary is put to expense in defending an unfounded suit or in administering or protecting trust property. *This is not* a case where the plaintiffs have either recovered or preserved a fund for the benefit of a class. *This is not* an action *in rem* where fees may be allowed for services rendered directly to the court or its representative. *This is not* a case resisting an application for the appointment of a receiver for a corporation, in which attorneys' fees may under some circumstances be allowed out of the undisputed property of such corporation.

*This is* a suit where the plaintiffs, attacking the validity of Governmental orders, valid on their face, seek to recover property, the right and title to which is claimed by the defendant (Federal Home Loan Bank of San Francisco) and seek attorneys' fees before a determination on the merits has been made. The plaintiff may not recover attorneys' fees out of the funds in dispute.

438

## C

In no event was the court authorized to award attorneys' fees out of funds deposited in the registry of the court. Such funds *are improperly in court because they result from impermissible collateral attacks upon administrative action. They are, therefore, not subject to disbursement by the court.*

Finally, the order awarding attorneys' fees cannot be sustained because the deposits out of which the fees are ordered paid were made in proceedings at most "in the nature of interpleader," and attorneys' fees may not be paid out of such deposits.

### Appellees' Contentions

Appellees have summarized their arguments, and their views concerning the foregoing theories of appellants are as follows: (Emphasis ours)

1. The Los Angeles action is not an action brought, as such, to review the actions of the commissioner (Board) evidenced by his Orders Nos. 5082, 5083, 5084. It is, on the contrary, a plenary equity action *quasi in rem* brought under 28 U.S.C.A. § 57 (now § 1655). In this action the effect of these orders of the Board which reorganized the Bank of Los Angeles into the Bank of San Francisco constitute the sole muniments of title under which the San Francisco Bank claims are drawn in question purely as an incident to the district court's inquiry into title, ownership and the right to possession of the assets and properties constituting the *res* before the court. In addition to this, and as an incident to its basic jurisdiction *in rem,* (over the assets in possession of the San Francisco Bank) the lower court has acquired jurisdiction *in personam* of the San Francisco Bank, the party in actual possession of *the assets and properties in dispute.*

2. The activities of the commissioner leading up to the seizure of the demanded assets and properties are subject to judicial scrutiny.

3. The contention of appellants that neither the Los Angeles Bank nor its member associations have any standing to question the *validity* of the (three administrative) orders of March 29, 1946, is devoid of merit.

4. The contention of appellants that the Home Loan Bank Board and its members are indispensable parties is devoid of merit; as is the contention that these are unconsented suits against the United States.

5. Under the plain provisions of 28 U.S. C.A. § 1655, the district court had and has plenary power and jurisdiction to hear and determine *all questions* material to the claim of Los Angeles Bank and its member associations that their respective titles to the assets and properties in dispute should be quieted, that clouds upon such titles should be removed and that possession of such assets and properties should be restored to their rightful owners.

6. Upon the case made by the pleadings in the actions below and by the findings in this proceeding, Los Angeles Bank is in precisely the same situation as is any corporation whose assets are seized by public authority in visitatorial proceedings.

(a) In such a case, the corporation, acting in good faith, is entitled to its day in court to contest the validity of the seizure and, irrespective of whether or not a case is ultimately made out for the interference of state or governmental authority, it is entitled to an allowance of fees to its attorneys. Otherwise, as the cases say, it would be hamstrung in any bona fide effort to defend itself.

7. Under such circumstances, an *interim* allowance of attorneys' fees is proper. The test is not that of ultimate success or failure in the litigation; it is whether or not the defense or the cause of action, as the case may be, is, as the district court here found, conducted in good faith and on reasonable grounds.

8. The district court did not err in directing payment of the attorneys' fees out of moneys in the registry of the court; and appellants' arguments to the contrary are moot and academic.

9. The pleadings in the Los Angeles Action show that the Los Angeles Bank was forced into a state of liquidation which liquidation is akin to, but much more drastic than in an ordinary receivership. Under such circumstances the corporation, or where there is a claim that it no longer ex-

ists, a stockholder in a class action, (such as association co-plaintiffs in the Los Angeles Action) must be allowed to litigate the validity of this seizure (under the Board orders above mentioned) and in analogy to receivership and liquidation cases must have the right to look toward the assets of the corporation for fees necessary to resist the seizure and liquidation, this since the test of the propriety of attorneys' fees *in such situations* is not the ultimate success or failure of the litigation since an interim allowance of fees prior to the conclusion of the suit is proper *where proceedings are conducted in good faith and on reasonable grounds.* To deny Wilmington that right, either by intimidating it not to use its own funds or where there is intimidation, by denying it recourse to a fund in court in which it has a *proprietary interest,* would be a denial of due process of law.

During the arguments before the lower court preceding the making of the order here on appeal, appellees contended that the Bank of San Francisco should be regarded as a "constructive trustee" holding assets belonging to the Los Angeles Bank which provides another ground of equitable jurisdiction; that this status of these parties makes it the "duty" of directors of former Los Angeles Bank to resist the wrongful seizure orders of the Board by every means at their power.

It will be noted that throughout the contentions of appellees, above noted, great stress is laid upon the nature and purpose of the Los Angeles Action which is yet to be tried. It cannot be doubted that the validity of the demands of Los Angeles for relief must be a major consideration in examining the claims of appellees. They have elaborated these contentions in their briefs to which we now turn.

The arguments of counsel for Los Angeles clearly indicate that its complaint was drawn with the purpose of justifying demand of the prayer for a *particular form* of relief. While one argument of Los Angeles is that the lower court should "scrutinize the activities" of the Commissioner because he omitted to make a "finding" of facts which would justify his three

orders, and *because* his "mode" of exercising the powers conferred on him by law, Home Loan Bank Act, was in defiance of statutory requirements, the real and basic theory underlying the Los Angeles case is that the three orders reorganizing the Home Loan Banks in the Pacific Coast area (sans this challenge as to procedural steps) were null and void *because enforcement of Board orders of this nature* must necessarily result in *confiscation* of private *property* and private *property rights* of Los Angeles and its association member-stockholders. This view of appellees is emphasized throughout this litigation and is based on the assumption that Federal Home Loan Banks possess the fundamental characteristics of private banking institutions and as such cannot be regarded in law as instrumentalities set up by Congress to perform public and governmental functions. This concept underlies and is the real basis of the Los Angeles Action, hence it also underlies and characterizes appellees' case since their claims asserted on this appeal stem from services rendered to Los Angeles and its association-member co-plaintiffs in the main case.

Appellants vigorously reject this thesis of appellees. They assert that as a matter of law these banks are public agencies, and arms and instrumentalities of the federal government and this irreconcilable conflict of views injects into the litigation an issue of dominating character and importance. And in reference to the Board this court accepts the view that the Federal Home Loan Bank Board is clearly an agency of the United States and a branch of the Executive Department of the Government, and we so hold.

We turn now to the phase of the case where this issue of public versus private character of the banks is discussed by the parties, and to contentions as to whether and to what extent private and proprietary rights were involved when the status of Federal Home Loan Banks in the Pacific Coast area was changed by the three reorganization orders of Administration which abolished the Bank of Los Angeles and created the Bank of San Francisco.

## III

### Is a Federal Home Loan Bank a Public or Private Banking Institution?

It is crystal clear that Los Angeles posits its main and controlling demand for relief on the assumption that Federal Home Loan Banks *must* be regarded in law as possessing *a private and proprietary character* which is not, (and cannot be) stripped away, diluted or diminished by the terms of the Federal Home Loan Bank Act under which they exist and operate. Its arguments dealing with the legal *status* of such banks are predicated on the theory that when the Bank of Los Angeles was abolished by administrative orders, these orders unlawfully confiscated and destroyed *private property and property rights* of Los Angeles. See our comments on the form of the Los Angeles Action in our opinion in the main case, supra, 196 F.2d at pages 345 to 348, inclusive. Such a concept, if sound in law, would logically require the conclusion that under the terms of the Federal Home Loan Bank Act not only the legal *status* of these banks but the corporate *control* by them over assets in their possession, may not lawfully be challenged, changed or affected by or under administrative orders of the Board.

Appellees' arguments leave some doubt as to whether they concede that *some* administrative controls, under the Home Loan Bank Act, may be validly enforced. However, the orders which abolished the Banks of Los Angeles and Portland and established the Bank of San Francisco are vigorously assailed as being *beyond the powers* of the administrative Authority set up by the terms of the Act—this primarily for reasons discussed in this part of our opinion. It is true that one of the grounds advanced in the attack on the orders is that they were (also) arbitrary and capricious and the product of ill-will and malice of Commissioner Fahey. But the fundamental thesis of Los Angeles and one that gives controlling character to its entire case is that the orders are void *because* they destroyed "private ownership" of the bank by its California member associations (of which its co-plaintiff in the so-called Los Angeles Action the Federal Savings and Loan Association of Wilmington was one).

The complaint in the Los Angeles Action leaves no doubt as to the real basis of that action. It charges that the administrative authority made an unlawful "seizure of private property" of Los Angeles when it issued and enforced the three reorganization orders. This alleged "seizure" is characterized as expropriation and confiscation of its private property "without any process of law"—as pure and simple "spoliation." To meet and thwart this claimed invasion and destruction of purely private property and property rights it resorted to an action *quasi in rem* to "quiet title" to the seized private property, under Title 28, § 1655, U.S.C.A., old § 57 the property in question being "the assets and properties" of the former Home Loan Bank of Los Angeles. It assures us that:

> "A reading of the [Los Angeles] complaint makes it perfectly obvious that *all of the elements* of the conventional cause of action in equity by an *owner* out of possession *to quiet title,* to remove a cloud on title *and to regain possession* are present. * * * The action *is purely and simply* an equitable action *quasi in rem to try title* as between one who alleges itself to be *an owner out of possession*—the Los Angeles Bank—and one who alleges itself to be *an owner in possession*—the San Francisco Bank."

Los Angeles adds the query:

> "By just what species of reasoning appellants arrive at the conclusion that the right to hold and deal in property *free from unwarranted interference and spoliation under color of governmental authority is not a legally protected right,* is not made clear." (Emphasis ours.)

In the face of these frank avowals it is impossible to misconceive the basic theory and premise upon which the Los Angeles Action rests.

If the above noted assumption is basicly sound in law, it would be impossible for the Board to formulate an order or orders which would *lawfully* abolish a Federal

Home Loan Bank. The prayer of Los Angeles (which is in harmony with the theory of its pleadings) is convincing proof that it would be denied the real (and only effective) relief it seeks unless the lower court has jurisdiction to enter, and does enter, a decree which, in practical effect, would be a judicial declaration that the former Home Loan Bank of Los Angeles enjoyed the legal status of a privately owned and privately controlled banking institution and that no administration order or orders of the Board could have the effect of abolishing or changing *that status*. Since the Los Angeles Action has not been tried, the nature and scope of the controversy must be viewed and appraised by the specific demands made in the prayer for relief.

The prayer, inter alia, demands a decree that the three Board orders "be declared and adjudged to be null, void and of effect," *and* "any and all clouds and purported liens thereby created upon * * * assets or properties of plaintiffs or any of them be removed"; that "the titles and right to possession of plaintiffs and each of them as against defendants and each of them to the assets and properties be confirmed and be declared, adjudged and established to be superior to and be quieted as against all claims or rights asserted * * * under * * * or by virtue of said purported orders * * *." The court is asked to issue a writ of possession to effect restoration of (claimed) assets to Los Angeles; require execution of all documents necessary to restore Los Angeles to title and possession of its (claimed) assets; and require an accounting of all assets of Los Angeles transferred by the orders. The prayer further demands that defendants be forever barred from asserting any claims whatever against the (claimed) assets of Los Angeles, and that the decree inure to the benefit of all members and stockholders of Los Angeles Bank. For reference to where prayer of complaint appears, see comment in footnote *22*, infra.

It is argued by appellees that *all* of the relief thus demanded in this prayer may lawfully be granted by an equity court despite the fact that the granting of such relief by judicial decree would completely bypass any sort of official action by the Federal Home Loan Bank Board. Thus, the orders may lawfully be set aside and nullified as completely as though they were made without a semblance of authority to be found in the Federal Home Loan Bank Act to make administrative orders of this character.

In the last analysis the validity of the claims advanced in the Los Angeles Action must rest upon the legal conclusion that *due process of law* requires that the "assets and properties" mentioned be held to be the *private property* of the shareholder association members of the Los Angeles Bank.[6]

*It is of course obvious that refusal of the court to grant a form of relief which conforms to this theory would strip the heart out of the case of Los Angeles.*

If we agree with the basic postulate of Los Angeles that purely "private property" was "confiscated without due process or any process of law" by orders which abolished a Home Loan Bank by "reorganizing" and "readjusting" banking elements and bank districts in the Federal Home Loan Bank System, we must go further and accept as sound law the inevitable corollary—that the granting of a "charter" (the organization certificate issued to Los Angeles under Section 12 of the Home Loan Bank Act) necessarily resulted in the creation of a private banking institution which thereafter passed (in a large and here undefined area) from under the most important of the administrative and legislative controls set up by Congress in the Federal Home Loan Bank Act.

We would also have to conclude that once granted by the Board under the Federal

---

6. As supporting the principle that the doctrine of "due process" applies only to the protection of *private* personal and property rights see Essex Public Road Board v. Skinkle, 140 U.S. 334, 11 S.Ct. 790, 35 L.Ed. 446; Attorney General of State of Michigan ex rel. Kies v. Lowrey, 199 U.S. 233, 26 S.Ct. 27, 50 L.Ed. 167; City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937. And see American Jurisprudence, Vol. 12, p. 288, Section 593.

Home Loan Bank Act, a "charter" invested a Home Loan Bank with all of the attributes and characteristics of a purely private corporation and immediately clothed it and all of the properties in its control and possession with *all* of the protections provided by general law as in a case where a purely private corporate enterprise was involved. *Thus it may not be deprived of its corporate existence by any administrative action of the Board because the very act of creating it under terms of the Act automatically gave it a "vested right" to*, and a "justiciable interest" in, a continued corporate existence as a private banking institution. This is a status which the courts will protect in the manner and to the full extent demanded by Los Angeles.

The noted arguments of Los Angeles can have no other legal meaning, unless we blind ourselves to the dominating and controlling issue presented in the Los Angeles pleadings. We make further comment on this phase of the case at a later point in this part of our opinion.

The terms of the Federal Home Loan Bank Act of 1932 provide the only authority for the "creation" of Federal Home Loan Banks which are required to operate within certain bank "districts" designated in Section 1423 of Title 12 U.S.C.A. It is sufficient to state that such banks are brought into existence by formal administrative action of the Board. When "created," the banks are authorized and required to perform the functions designated in the Act under a so-called "organization certificate", Section 1432, which document is issued by and under authority vested in the Board. This certificate is evidence of the corporate existence of such banks as an integral part of what is frequently referred to as the Federal Home Loan Bank System. By regulations of the Board these "organization certificates" are to be deemed the "charter" of a bank.

The "charter" of the Bank of Los Angeles was executed by the first directors of the Bank under date of October 13, 1932, and this charter contains, among other things, the following provisions:

"2. The location of the principal office of this Bank will be in the City of Los Angeles, State of California, or at such other city as the Federal Home Loan Bank Board may from time to time determine is suited to the convenient or customary course of business of the institutions eligible to become Members of this Bank.

"3. This Bank shall be established in the City of Los Angeles, State of California, in District Number Twelve, as defined by the Federal Home Loan Bank Board, or as may from time to time be readjusted or modified by said Board. Said District Number Twelve as now defined is as follows:

"The States of California, Arizona, Nevada and the Territory of Hawaii.

"7. This Bank shall have succession until dissolved by the Federal Home Loan Bank Board under this Act or by further Act of Congress."

A true and correct copy of the organization certificate or corporate charter of the former Federal Home Loan Bank of Los Angeles is set forth at length in the printed transcript on the appeal in the main case (No. 12,511) at pp. 4144 to 4149. A true and correct copy of the organization certificate or corporate charter of the former Federal Home Loan Bank of Portland is also set forth at length in the same printed transcript at pp. 4149 to 4154.

If we agree with Los Angeles and appellees in this case we would also have to conclude that provisions in the Federal Home Loan Bank Act relating to the "acquisition" of one Home Loan Bank by another, the liquidation of one bank as a result of such "acquisition" under orders or directions of the Board, "payment of the liquidated bank"s liabilities," and "retirement of its stock," are incidents in the business affairs of these banks comparable in character to similar transactions in the field of private corporate enterprises and that *all* such incidents *must be governed in all essential respects* by the rules of law and common business practices applicable to such transactions in the world of private business. Such a conclusion is irresistible if the former Bank of Los Angeles must be regarded in law as a private banking venture and not as a public banking agency.

In argument to the lower court counsel for the Bank of San Francisco contended that Federal Home Loan Banks really "go into business with the federal government" and that part, or much of their initial capital is frequently supplied by the federal government in the early stages of the bank's existence. Counsel also pointed out to this court and to the court below that at the inception of the Los Angeles Action the federal government owned more than 51% of the capital stock of the Los Angeles Bank.[6½]

· At the conclusion of Part one of this opinion we made reference to the "Return" of San Francisco to the order to show cause why the motion of Association to impound the funds claimed by Association should not be granted. In this "Return" (dated March 8, 1948) San Francisco alleged that: "the outstanding capital stock of San Francisco Bank, as of January 30, 1947, was of the par value of $27,535,100, of which stock of the par value of $15,927,-900 was and still is owned by the United States." Apparently this assertion is not denied. As an indication of the continuing financial interest of the federal government in the Bank of San Francisco, it was shown by the testimony of the Treasurer of the San Francisco Bank that during the year 1948 this bank paid large sums of money to the Treasurer of the United States as dividends on stock in that bank owned by the government.

Much controversy was injected into the case by contentions dealing with the problem of whether or not the federal government had a right to "vote" the stock it held in Home Loan Banks, an aspect of this litigation which does not minimize the importance or significance of the fact that the government is a stockholder in San Francisco, and was a stockholder in the former Bank of Los Angeles.

In noting claims of Los Angeles as to the *status* of Home Loan Banks we do not consider it necessary to set forth the text of the many sections of the Federal Home Loan Bank Act which spell out the completeness of the administrative and legislative controls over Federal Home Loan Banks—it is sufficient to say that the regulatory provisions of this Act reveal an intention on the part of Congress to retain the broadest kind of federal control over the number, powers and existence of these purely legislative creatures.

A brief reference to the Home Loan Bank Act will reveal the sweeping and plenary character of these legislative and administrative controls which are made the price of a bank's very existence—promoters of such banks are charged with full knowledge of this fact. And we assume that such promoters would not contend that private individuals have some sort of "inherent right" (or constitutional right) to organize and thereafter operate a so-called "Federal Home Loan Bank" and exercise any of the statutory powers granted to such a banking institution without receiving a "charter" from the Board and/or without any attempt to comply with the many requirements and regulatory provisions of the Federal Home Loan Bank Act. And see provisions of Section 1441, Title 12 U.S.C.A. on penalties for misuse of title.

6½. During final argument in the lower court on the allowance of attorney's fees here considered appellants again tendered an affidavit of (Riordan) an official of the Federal Home Loan Bank Board in which he stated, inter alia, "that up to and including August 31, 1949, either the Reconstruction Finance Corporation or the United States Treasury *has always* been the majority stockholder of the Federal Home Loan Bank of San Francisco, formerly called the Federal Home Loan Bank of Portland, *as well as the former Federal Home Loan Bank of Los Angeles.*" On its own motion, the lower court had previously stricken this affidavit in response to contentions of appellees that "who owned the capital stock of the bank, in what proportion and what was the book value of the stock," was a matter related to the merits of the case and not to the immediate issue. The lower court struck the affidavit as "immaterial." When it was later offered by appellants (as above noted) the court stated that it did not see how the Riordan affidavit was "material at the moment." And see Title 12 U.S.C.A. § 1426(k) providing that "All stock of any Federal Home Loan Bank shall share in dividend distributions without preference."

Furthermore, men do not go blindly into these Home Loan Bank ventures—they assume all of the obligations with all of the legislative and administrative "strings" attached when a charter is granted to them by the Board. Courts may not remain indifferent to the presence of this type of plenary control set up by Congress—a "life and death" type of control which Congress has seen fit to maintain without any material changes since the advent of the Act in 1932.

■ The administrative control mechanism thus set up by Congress is a vital adjunct of the bank system, and by adopting it Congress charted a course of business conduct for these banks thus becoming the controlling force in their lives. Any other view would sanction the unacceptable theory that a mere creature of Congress may become greater than its creator without the author of its existence becoming aware of the fact.

It cannot be doubted that if Congress saw fit to repeal the Federal Home Loan Bank Act, such a legislative act would end the official existence of every Home Loan Bank in the nation now functioning under that Act, for all of the rules which guide and control the operations of such institutions would cease to be effective. Such a contingency must be left to speculation. Certainly no "due process" argument based on the Fifth Amendment could be successfully invoked to tie the hands of our national legislature if it desired to end a banking system it had created. That no illusions might remain concerning the intent of Congress to retain a firm control over the life tenure and affairs of these banks, it adopted the expedient of serving an unusual and very blunt legislative caveat in the language of Title 12 U.S.C.A. §§ 1445, 1446 and 1449 concerning the matter of *continued existence* of Home Loan Banks. These legislative pronouncements cannot be regarded as other than a deliberate notice that in enacting the Home Loan Bank Act Congress did not create, or intend to create, any sort of "vested right" in either the *continued existence or status* of any bank in the Home Loan Bank System, or for that matter, any vested right in the continued existence of the Federal Home Loan Bank System itself. It is not necessary to decide what disposition would be made of the assets of Home Loan Banks if the Federal Home Loan Bank System was abolished. It may be assumed that if the Home Loan Bank System was terminated by legislation, the banks in that system would be liquidated in an orderly manner, and under congressional mandate their capital assets distributed back to the owners of stock after financial obligations of the bank were fully discharged.

In the face of the plain legislative pronouncements we have noted we must and do conclude that Congress, and not the courts, may continue or end the System or any part of it; that Congress and not the courts may direct *how, where and when* a Home Loan Bank is to function. An *affirmative action* by Congress (or the Board under authority of, and within the provisions of law referred to in the above paragraph) is the sine qua non of change in the *status* of any bank—the tail would literally wag the dog if courts could exercise a power to *compel or thwart* action by the Board or Congress in the field of control where Congress has so specifically and bluntly reserved to itself and to its administrative agent, the Board, the exclusive power to make effective decisions.

Nor did the Act create, or purport to create, any so-called "proprietary rights" of association members in the continued existence of any Home Loan Bank, or "rights" of any kind which might be successfully interposed as a bar to ending the existence of a bank if Congress, or the Board, (within the terms and conditions imposed by Title 12 U.S.C.A. § 1423) eliminated it by readjusting bank districts. Yet basically and fundamentally, and particularly as respects Board action, such a theory underlies the entire case of appellees and Los Angeles, i. e., that the Los Angeles Action cast in the form employed may successfully invoke judicial action which, in effect, would literally supplant official Board and/or Congressional action. (See further comments dealing with "rights" of association members in Part 5 herein.)

■ By way of further emphasis we add that we are convinced that Congress on any consideration it deemed advisable could have readjusted the Eleventh and Twelfth Districts in the Home Loan Bank System, could have liquidated and dissolved the Los Angeles Bank, and could have transferred its assets to the San Francisco Bank, all without notice and hearing, and based upon information obtained in any manner it saw fit. Appellants have so argued and they support their view by such cases as Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138. Attention is also directed to the language of Mr. Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 167, 71 S.Ct. 624, 646, 95 L.Ed. 817, where he stated:

"Again, when decisions of administrative officers in execution of legislation turn exclusively on considerations similar to those on which the legislative body could itself have acted summarily, notice and hearing may not be commanded by the Constitution."

Congress delegated *that power* to the Board; see Sections 3, 25 and 26 of the Home Loan Bank Act; and appellees do not deny the constitutionality of the delegation. Consult School District No. 3 of Town of Adams v. Callahan, 237 Wis. 560, 297 N.W. 407, 135 A.L.R. 1081. The exercise of a power so clearly and unmistakably delegated to the Board by Congress did not require that notice and hearing be granted by the Board as a prerequisite of action by the Board. And we think that exercise of its delegated powers in the issuance of the challenged orders does not present a constitutional question.

■ We also agree with appellants that *funds* handled by these banks are *used* only in the performance of public and governmental functions, hence they are properly to be regarded as possessing the nature of "public funds." Cf. Inland Waterways Corp. v. Young, 309 U.S. 517, 524, 60 S.Ct. 646, 84 L.Ed. 901; D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956; Federal Deposit Insurance Corp. v. Citizens State Bank, 8 Cir., 130 F.2d 102. We think that sound public policy intrudes in a situation such as is presented in the Los Angeles Action where the very nature of its claim constitutes an assertion that *use* of the funds in possession of the former Bank of Los Angeles may lawfully be directed and controlled by its directors in the same manner and to the same degree and with the same results as though that bank was the absolute private property of its association members, and was conducted *exclusively* for their private profit. And "management" of a Home Loan Bank does not mean "ownership" of the bank.

There is an analogy between this sort of a system of regional reserve banks to service institutions engaged in the field of home mortgage financing under the supervision and control of a central administrative agency acting under Congressional mandate, and the plan of reserve banks embodied in the Federal Reserve System for banks generally, 12 U.S.C.A. § 221, and the Federal Farm Loan Act for farm mortgages, 12 U.S.C.A. § 641. Comparison of these systems, (with certain characteristics in common) is not so far inapposite as to justify overlooking judicial expressions concerning the nature and functions of the regional reserve banks established by the two earlier Acts just above mentioned, for these expressions add emphasis to the contentions of appellants. There is a sufficient similarity of plan and purpose in these three institutional set-ups to make cases dealing with the Federal Reserve System and operations under the Federal Farm Loan Act pertinent to the present inquiry. The rationale of cases dealing with the last two named operations lend support to the view that a reserve bank created pursuant to a Congressional act is a government instrumentality—hence the functions it performs are "governmental." Consult Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 102, 62 S.Ct. 1, 86 L.Ed. 65; Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; Federal Land Bank v. Gaines, 290 U.S. 247, 54 S.Ct. 168, 78 L.Ed. 298; Osborn v. Bank of the United States, 9 Wheat. 738, 860, 6 L.Ed. 204.

█ Since, as we later indicate, a Federal Home Loan Bank is a federal instrumentality organized to carry out public policy and its functions are wholly governmental, neither the bank nor its association members, although they are nominally stockholders, acquire under the provisions of the Bank Act, any vested interest in the continued existence of said bank or any legally protected private rights which would enable them to invoke the due process clause. People's Bank v. Federal Reserve Bank of San Francisco, D.C., 58 F.Supp. 25; Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65; Knox National Farm Loan Ass'n v. Phillips, 300 U.S. 194, 202, 57 S.Ct. 418, 81 L.Ed. 599; Federal Land Bank v. Gaines, 290 U.S. 247, 254, 54 S.Ct. 168, 78 L.Ed. 298; Greene County National Farm Loan Ass'n v. Federal Land Bank, 6 Cir., 152 F.2d 215, certiorari denied 328 U.S. 834, 66 S.Ct. 978, 90 L.Ed. 1610. (And see further comments in Part 5 herein on contentions concerning claimed "property interests" of federal association members in a Federal Home Loan Bank.)

In this view of the law the controlling issue is and must be whether *the claim* of Los Angeles that under law it has a vested right to a continuous corporate existence, has merit. We are fully persuaded that such a claim does not, and can not, reach the dignity of an assertion of a legal right in the strict sense since clearly it does not appear from "the nature and character of the (basic) legislation that Congress intended to create a statutory privilege protected by judicial remedies." See Stark v. Wickard, 321 U.S. 288, 306, 64 S.Ct. 559, 569, 88 L.Ed. 733.

The Los Angeles Bank and the district it serves were initially created in the sole discretion of the Board, and the Board was specifically authorized to "readjust" all bank districts, Sec. 3, 12 U.S.C.A. § 1423; during its lifetime, the Bank was directed to act *only* "subject to the approval of the board" Sec. 12, 12 U.S.C.A. § 1432, and could be required, without its consent, to assume the obligations of consolidated debentures of *all* of the banks in the System or otherwise extend credit to the other Banks, as the Board might direct, Sec. 11, 12 U.S.C.A. § 1431; and was given succession *only* "until dissolved by the board" Sec. 25, 12 U.S.C.A. § 1445. Certainly such a sweeping grant of powers to the Board over Federal Home Loan Banks negatives in vigorous fashion any intention that the grant of corporate existence to the Los Angeles Bank should create in that Bank "a statutory privilege (of permanent existence) protected by judicial remedies."

█ This legislatively created system of Home Loan Banks exemplifies the principle that whatever rights and privileges Congress may constitutionally confer, it may withhold—and by the same token if privileges are conferred, they may be granted upon such terms and conditions as Congress may see fit to prescribe. The beneficiary of privileges so conferred may not be heard to question the authority of the Congress to enforce the express terms of a legislative grant of privileges through the medium of an administrative agency it created to enforce such terms.

It would serve no useful purpose to further elaborate the issue of private versus public character of Federal Home Loan Banks. It is clear that such "rights" as these banks possess or may lawfully exercise stem only and exclusively from grants of limited authority under federal legislation and not from possession of any of the purely inherent characteristics and attributes of orthodox private corporate business enterprises. Our reading and interpretation of the Federal Home Loan Bank Act leaves us with the firm conviction that when it set up the "Federal Home Loan Bank System," in 1932, the Congress of the United States thereby intended to, and did, create a Federal agency and instrumentality of the legislative branch of the federal government to carry out and discharge important governmental functions, to wit, the furnishing of reserve banking facilities for saving and loan associations and similar institutions within a district created by the Board through the medium of a Home Loan Bank in that district which is chartered by the Board.

We hold that all Federal Home Loan Banks within the System are, and operate

as, public banking agencies and instrumentalities of the federal government, and as such have no justiciable (and proprietary) interest in their continued existence.

Los Angeles and appellees reject all of the conclusions we have expressed in this Part of our opinion. As we have indicated, they contend that under the particular form in which Los Angeles cast its complaint the equity powers of the court were invoked which fact gives the court jurisdiction *for all purposes* which of course would include the granting of *all forms of relief demanded in the complaint.* This conclusion is said to find support in the familiar doctrine that where equity has properly assumed jurisdiction, it has the power to decide all relevant matters and to do complete justice between the parties, even to granting relief ordinarily cognizable only at law.

This contention suggests a consideration of exactly what the court would be required to do to implement the sort of decree which would provide the *specific relief* demanded by Los Angeles. We turn now to the problem posed by that contention (see Part 4) for it necessarily includes within its scope the "relief" which the decree (to be effective) *must grant without any action whatever by the Board, official or otherwise.* An interesting aspect is that such a decree would wholly escape the orbit of the familiar doctrine that "equity follows the law"—in this case, "the law" laid down in carefully measured terms in the Federal Home Loan Bank Act.

## IV

### Necessity for Board Action Considered

■ It is not contended that in the main case out of which this appeal grows and upon which it is grounded, personal service of process was ever had upon Commissioner Fahey within the State of California. He was not a resident of the State of California, and the official residence of Administration was then in the District of Columbia (as is also the case with the present Board). As the arguments to which we now refer will indicate, *complete reliance* is placed on the sufficiency of "substituted service" upon Fahey under the form of action relied on by Los Angeles.

We conclude and therefore hold that the "substituted service" on the Commissioner (Fahey) did not confer jurisdiction in personam over the Commissioner (and see footnote 9, infra).

As to the effect of "substituted service" on Fahey, no contention is made that such service conferred personal jurisdiction over the present Board since the substituted service of 1946 is based on the language of (now) Title 28 U.S.C.A. § 1655 and does not purport to confer personal jurisdiction upon absent defendants so served, but authorizes only a judgment affecting the property which is the subject of action. Los Angeles poses the problem in the following language:

"Since the case has not been tried, the scope of the controversy must be measured by the claims set forth in the complaint. In this connection, it is worthy of note to point out that the answer of the San Francisco Bank admits that it claims the disputed assets solely under and by virtue of the three administrative orders above referred to; in other words, the sole muniments of title upon which it relies in this action *quasi in rem* to quiet title, to remove clouds on title and to regain possession, are these three administrative orders.

"On the merits then, *the fundamental question below* concerns the basic power of a court in equity, in an action *quasi in rem,* to adjudicate property rights as against a claim that the administrative nature of the acts underlying the controversy preclude the exercise of its historical jurisdiction in this regard." (Emphasis ours.)

■ We do not agree with the theory underlying the foregoing argument. We are convinced that the indispensable prerequisite to a decree quieting title in this case would be a determination of the *validity* of the administrative orders complained of and we also agree with appellants that the heart of the Los Angeles Action is the alleged invalidity of the orders. Here Los Angeles makes a collateral attack on the validity of the orders by an action to recover property (all located in California)

and remove clouds on title and on this basis sought and secured the order for substituted service under 28 U.S.C.A. § 1655. In the absence of jurisdiction in personam over the Commissioner (Fahey) under the substituted service above mentioned, and absence of jurisdiction in personam over the present and functioning Board and/or its members, we think that these orders can be attacked only in a direct action to set them aside; they are valid until set aside in an appropriate judicial proceeding where the administrative authority is brought within the personal jurisdiction of the court, *or* they are terminated by subsequent order of the present Board.[7] In our view the Los Angeles Action necessarily proceeds on the presumed invalidity of the orders, a presumption that the law does not permit in an in rem action like the Los Angeles Action, since such an action constitutes a collateral attack on their validity and therefore cannot be maintained. Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999.

Los Angeles and appellees do not agree with the conclusions stated in the preceding paragraph. They go even further in rejecting it and buttress their more sweeping rejection by arguments which make clear that under their theory the question of whether it was necessary (in 1946) to secure personal jurisdiction of the lower court over Commissioner Fahey (or over the later and present Federal Home Loan Bank Board and/or its members) as a basis of jurisdiction in the lower court to grant *all relief* demanded by Los Angeles, is a matter of no importance. On this point they emphatically urge that no sort of official administrative action by the present Board is necessary (or is here sought) in order to give the lower court jurisdiction to enter a decree which in every essential respect will *completely restore* the former Bank of Los Angeles to its former position and status in the Federal Home Loan Bank System. In arguments related to this phase of the case Los Angeles assures us that under its *quasi in rem* procedure to try title to assets it claims from the Bank of San Francisco, there is no necessity for the court to engage in any "species of *review* of the administrative orders." It is said that the problem is not whether the orders should be set aside in an administrative sense but whether they (and particularly Order No. 5082) operated to transfer title of assets of Los Angeles to the Bank of San Francisco. This "certainly does not call for a setting aside of the orders as in the case of an administrative review." The orders could not and did not operate to transfer title and "had no more effect than would a wild deed, executed in favor of the San Francisco Bank by a third party not connected with the title"; therefore a question of this character does not "go to the *jurisdiction* of the District Court."

It is clear that Los Angeles and appellees assume that because the lower court acquired jurisdiction in personam over the Board-chartered Bank of San Francisco it must necessarily follow, as a matter of law, that under the form of action instituted by Los Angeles, the lower court is now vested with jurisdiction to ignore the existence of the Board and enter a decree which sets aside and completely nullifies the challenged 1946 orders of Administration. That this theory also underlies the complaint of the plaintiffs in the Los Angeles Action is made evident by the vigorous contention that in order to be *fully effective* in providing *all* of the relief demanded by Los Angeles the decree of the court *"need not require the* [present] *Board to do a single thing, either directly or indirectly"—this because "the decree will effectively grant the relief desired by Expending Itself on the San Francisco Bank, which is before the Court and is in possession of the disputed assets."* [8] (Emphasis ours.)

7. United States v. Corrick, 298 U.S. 435, 440, 56 S.Ct. 829, 80 L.Ed. 1263; United States v. Vacuum Oil Co., D.C., 158 F. 536; Lehigh Valley R. Co. v. United States, 3 Cir., 188 F. 879; Queens County Group of Savings and Loan Associations v. Home Loan Bank Board, D.C., 104 F.Supp. 396 and later opinion in same case in D.C., 106 F.Supp. 504. And see cases cited in footnote 23, infra.

8. Los Angeles carefully accented the precise nature of its action in its brief in the main case. On the merits it there contended that the fundamental question in the litigation is the *basic power* of

To sustain the validity of these conclusions appellees advance the following revealing argument:

"Repeated decisions of the Supreme Court indicate, however, that *neither Fahey nor the Home Loan Bank Board* were or are indispensable parties to this controversy over title and right to possession of the seized Los Angeles Bank assets. *The test, as laid down by the Supreme Court is whether or not the decree may be said to be capable*

a court in equity, in an action quasi in rem, to adjudicate property rights as against a claim that the administrative nature of the acts underlying the controversy *preclude the exercise of its historical jurisdiction in this regard.* It asserts that the lower court has jurisdiction in personam over the Bank of San Francisco, the party in possession of the res; San Francisco concedes that down to March 29, 1946, the Bank of Los Angeles was either the owner, or in any event, was entitled to possession of the properties and assets in dispute. *This means* that any decree that might be rendered directing a return of these properties and assets *"would be directly operative * * * would expend itself completely, as the cases say, upon the San Francisco Bank without requiring any action whatever by the Home Loan Bank Board."*

See footnote 22, infra, where we cite pages in the record in appeal No. 12,511 where the prayer of the complaint in the Los Angeles Action and the prayer of a cross claim of Los Angeles are set forth. In referring to these prayers it will be noted that the relief therein demanded is against the "Federal Home Loan Bank of Portland." In Part 6 of this opinion we make specific reference to the provisions of Order No. 5082, the full text of which appears as Footnote 5 in our opinion in the main case, No. 12,511. While the prayer in each of these pleadings (filed in the early stages of the Los Angeles Action) calls upon the court to require that the Federal Home Loan Bank of Portland do and perform certain acts, equivalent relief is now sought against appellant the Federal Home Loan Bank of San Francisco. This is due to the fact that Order No. 5082 moved the Bank of Portland to the City of San Francisco, California and directed that it should thereafter be known as the Federal Home Loan Bank of San Francisco. In this sense the Bank of San Francisco is successor to the Bank of Portland, and appellees herein now demand in their brief that the present Bank of San Francisco be required to do and perform the acts which were originally demanded be done by the Bank of Portland.

As a part of the relief originally demanded against the Federal Home Loan Bank of Portland a decree was prayed for which required that Bank to make "such deed or deeds, assignment or assignments or other instruments necessary or proper to vest in the Los Angeles Bank title and right to possession to any and all of the above assets and properties now in the possession of the Portland Bank and to deliver possession of same pursuant hereto"—and that in default of such action the lower court appoint a commissioner or other appropriate officer duly authorized in and by its judgment and decree to execute such instrument or instruments in behalf of the Bank of Portland, and that process issue in order that the Los Angeles Bank may be let into possession of such assets.

The prayer demanded that the Portland Bank be required to account to plaintiffs in the Los Angeles Action with reference to any and all acts and omissions done or omitted to be done by it with reference to said assets and properties during its possession thereof and that judgment be rendered against it for any balance thereby found to exist in favor of said plaintiffs or any of them; that the defendants in the Los Angeles Action and their successors and assigns be forever barred from asserting any claims whatever as against said assets or properties or any part thereof arising out of or by virtue of said purported orders of the Commissioner or arising out of or by virtue of any things done pursuant to said orders; that the court entertain jurisdiction and proceed to the hearing and adjudication of the Los Angeles Action as against the Portland Bank "in the same manner as if said defendant Fahey had been served with process within this district," such adjudication, in such event, to affect only the assets and properties which are the subject of the Los Angeles Action as well as the validity or invalidity of any legal or equitable liens upon or claims to or incumbrances or liens or clouds upon the title of the same or any thereof. The prayer demands that the judgment and decree inure to the benefit of any and all members and stockholders of the Los Angeles Bank similarly situated to plaintiff associations who were joined in the Los Angeles class action.

*of expending itself against the subordinate of the governmental agency involved; here, of course, the San Francisco Bank."* (Emphasis ours.)

No cases dealing directly or indirectly with the power and authority of the Federal Home Loan Bank Board under the Home Loan Bank Act are cited (and none are to be found in the books) which support the legal theory that, under Section 1655 of Title 28 U.S.C.A. an in rem jurisdiction of a California District Court over the Home Loan Bank of San Francisco (itself admittedly a mere subordinate creature of administrative action of the Board) will sustain a decree with the far reaching consequences of the one here sought. But it is urged that the holding of the Supreme Court in Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95, sustains appellees' argument just above set forth, this because the Bank of San Francisco is before the court; is in actual possession of the assets of the former Los Angeles Bank, *and nothing remains to be done* except the entry of a decree which restores (re-activates) the former Bank of Los Angeles and orders and directs that the assets of that bank now in possession of the Bank of San Francisco be placed in possession of the "re-activated" Bank of Los Angeles.

In further support of the principle here invoked appellees cite Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231; Jeager v. Simrany, 9 Cir., 180 F.2d 650, 651; Rank v. Krug, D.C., 90 F.Supp. 773, 802; Reeber v. Rossell, D.C., 91 F.Supp. 108, 111; National Radio School v. Marlin, D.C., 83 F.Supp. 169, 170 and Varney v. Warehime, 6 Cir., 147 F.2d 238. The last mentioned case is said to express "the guiding principles."

In connection with the foregoing argument with its rejection of principles we regard as firmly imbedded in administrative law, appellees do not favor us with an expression of their views as to the significance of the pronouncements in Blackmar v. Guerre, 5 Cir., 190 F.2d 427 and the same case on appeal reported in 342 U.S. 512, 72 S.Ct. 410. And see Payne v. Fite, 5 Cir., 184 F.2d 977 which also considers the controlling limitations of the doctrine espoused by Los Angeles and appellees. See also cases cited in footnotes 7 and 23.

It is to be noted that the Bank of San Francisco is only to be required to *surrender* the assets mentioned. It may be assumed that the demand of Los Angeles for "relief" necessarily had to stop at this point because no provision of law can be found in the Home Loan Bank Act which would authorize the subordinate Bank of San Francisco to act for and on behalf of the Board in the performance of any of the administrative functions of the Board (including the "restoration" or "re-activation" of an abolished Federal Home Loan Bank), *or* that any provision of law exists by virtue of which the Bank of San Francisco could lawfully take any sort of corporate action which could possibly affect, or direct the performance of, official duties or actions of the Board such as the re-adjustment of bank districts which is here inescapably involved.

All banks of the Federal Home Loan Bank System are required to exercise the powers vested in them "subject to the approval of the board"; for a court to order a subordinate Home Loan Bank to perform any of the Board's functions would be a judicial act without a vestige of sanction in the Home Loan Bank Act; furthermore the lawful existence of the Bank of San Francisco is challenged by appellees. In any event, no court has jurisdiction to authorize or direct a district bank to take any sort of action in the performance of which it would be compelled to ignore or violate any of the restrictions, limitations or controls which the Home Loan Bank Act imposes on it. Since it is conceded (and properly so) that the Home Loan Bank of San Francisco is but a subordinate segment of a nation-wide federal banking system it must necessarily conform (under its charter) to all provisions of the Home Loan Bank Act and to the rules and regulations of the Board. So far as the Los Angeles Action is concerned that bank comes squarely within the doctrine laid down in Payne v. Fite, supra.

But appellees avoid the force of this doctrine by the argument that the lower court has "plenary power" to adjudicate the

Bank of San Francisco a constructive trustee and order it *"to return the assets demanded by Los Angeles without in any way touching the orders in question."* The decree having accomplished *this much*, appellees appear to assume that it would have presumptively "expended itself."

As indicated in part three herein, it is contended that sitting as a court of equity, the form of specific relief demanded is within the power of the court in a proceeding *quasi in rem*, under Section 1655 of Title 28 U.S.C.A. It is also suggested that such relief in personam would be purely in aid of *and incidental* to an in rem jurisdiction over the property itself. In support of the view that the court need not touch the orders Los Angeles cites Title Insurance & Trust Co. v. California Development Co., 171 Cal. 173, 198–199, 152 P. 542.

To support the argument that the three orders are "involved" *only as an incident* to the claimed equity jurisdiction of the court, appellees cite Jellenik v. Huron Copper Mining Co., 177 U.S. 1, 20 S.Ct. 559, 44 L.Ed. 647; Harvey v. Harvey, 7 Cir., 290 F. 653.

We need not labor the point that the various contentions of appellees are in themselves a blunt repudiation of the idea that to secure the relief Los Angeles demands it must *also* ask the court *to order and direct the Board* to take some or any sort of official action to withdraw or nullify the three orders. They are also a complete repudiation of the idea that personal jurisdiction over the (present) Board and/or its members must be secured (or is at all necessary under the theory of Los Angeles) in order to give the lower court jurisdiction to make and enter in the main case a decree of the character here sought.

■ It is clear from the record and the briefs in the main case and in this case, that appellees and Los Angeles also completely reject the theory that the Board and/or its members are necessary or indispensable parties in this entire litigation. Their assumption is that as an agency of the United States under the Federal Home Loan Bank System the Board may be wholly disregarded in any of the steps taken by Los Angeles in the Los Angeles Action which is yet to be tried. Not only is it said that the Board and its members are not indispensable parties to the Los Angeles Action but it is further urged that this action is not an unconsented suit against the United States; that under Section 1655, supra, absent defendants may be served (as they were in the Los Angeles Action) by *substituted service* on (then) Commissioner Fahey; that Fahey appeared by various motions in which he attacked the jurisdiction of the lower court over the subject matter of the Los Angeles suit and over his person; that Fahey's successor (the Board) has subsequently answered as to the merits while "attempting" to preserve the jurisdictional points. (Parenthetically, we state that in our view the jurisdictional challenge was properly and effectively preserved.) [9]

9. Throughout all of the proceedings in the Los Angeles Action Fahey (and later the Board) have consistently maintained a challenge to the jurisdiction of the lower court and to its attempt to exercise personal jurisdiction over them, or any of them. These challenges were made at the outset of the litigation and reiterated at every appropriate opportunity, and they reach to the right of Los Angeles to maintain its action and to the jurisdiction of the court in that action.

The effectiveness of this sort of challenge to the jurisdiction is not lost, nor is not waived by coupling it (as was done here) with a defense on the merits. It is basic under Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., that a challenge to the jurisdiction of the court may be joined with a defense on the merits without *any* waiver resulting. See Orange Theatre Corp. v. Rayherstz Amusement Corp., 3 Cir., 1944, 139 F.2d 871, 874; Gerber v. Fruchter, 2 Cir., 1945, 147 F.2d 120; Blank v. Bitker, 7 Cir., 135 F.2d 962; Devine v. Griffenhagen, D.C., 31 F.Supp. 624; 2 Moore's Federal Practice, p. 2260, 2nd Ed.

It is true that the lower court made a formal finding that these nonresident defendants (sometimes referred to as the "absent defendants" or "official defendants") have sought and obtained affirmative relief and thereby submitted to the jurisdiction of the court, and that previous orders of the court have established such general appearance and sub-

452

Appellees indicate that they are quite persuaded that in any event, and as to the Board, the jurisdictional challenge of appellants is entirely without merit. On this point they emphatically urge that *"for the purposes of jurisdiction * * * it is manifestly of no moment whether Fahey or the Board actually appeared or not"* since both said Section 1655 and its predecessor Section 57, supra, provide that where the absent defendant does not, *after substituted service,* appear, the adjudication shall, as to him, "affect only the property which is the subject of the action." Appellees add that "so far as Commissioner Fahey and his present successor [Board] are concerned, the jurisdiction of the District Court to adjudicate title and right to possession of the demanded properties and assets attached at the moment [substituted] service was made upon the late Commissioner. *"Whether he was an indispensable party to this controversy or whether he was not,* the District Court obtained jurisdiction then and there to adjudicate his claims, if any, with reference to the [Los Angeles Bank] assets." And speaking for Los Angeles appellees assure us that "It is only such a decree—one affecting only the property which is the subject of the action—which is sought in the Los Angeles phase of the litigation. The prayer is that the assets and properties be recovered, that title in appellees be quieted and confirmed, and that any cloud occasioned by the three orders be removed." And the right of the lower court to enter such a decree is thought to find justification in the views expressed in Jellenik v. Huron Copper Mining Co., supra; Harvey v. Harvey, supra, and McRoberts v. Independent Coal & Coke Co., 8 Cir., 15 F.2d 157.

Thus the characterization given its action by Los Angeles as purely one to recover property and to remove clouds from title to assets and property within the State of California reveals the fundamental nature of the suit and the basis upon which it

sought and secured an order for substituted service under Section 1655, supra.

■ The very nature of the action brings to the front a question of law as to indispensable parties. The law as applied to the necessity for the presence of superior administrative officers in actions wherein *the validity* of their acts is questioned, has been recently restated in Williams v. Fanning, supra, and has been followed by this Court in Daggs v. Klein, 9 Cir., 169 F.2d 174. These cases reaffirm the rule that a superior administrative officer is an indispensable party to an action where the relief sought will require him to take action, either by exercising a power lodged in him *or by having a subordinate exercise it for him.* Williams v. Fanning, supra, 332 U.S. at page 493, 68 S.Ct. at page 189. The Fanning case also emphasizes that such superior official is indispensable to an action in which the relief requested would involve "risk that the judgment awarded would 'expend itself on the public treasury or domain, *or interfere with the public administration.'"* 332 U.S. at page 493, 68 S.Ct. at page 189.

■ Under either of these two tests the presence of the Home Loan Bank Board and its members is required in this action. The relief requested requires the redivision of the present Eleventh District into two districts for there can be one and only one bank to a district. It requires the reactivation of the Los Angeles Bank. It requires the appointment and election of officers and directors of the reactivated bank, for the terms of such officers and directors have long since expired. (Directors serve for definite terms and not until their successors are elected and qualified. Section 7, Federal Home Loan Bank Act.) It would also require the reactivation of the Portland Bank, as such. It would require issuance of new certificates of stock by both the Los Angeles and Portland Banks. None of these requirements or any other essentials to the granting of the relief prayed for in

mission, hence are final by failure to appeal from them.

We conclude that findings of this character are clearly erroneous as a matter

of law for they were made in the teeth of the persistent objections above referred to.

the Los Angeles Action is possible without action by the Board since, under Section 12 of the Act, no bank may exercise any functions vested in it by the Act except "subject to the approval of the board". To us it is obvious that a decree of the court which was capable of granting the relief which the appellees and Los Angeles seek would necessarily have to require the Board "to take action * * * by exercising * * * a power lodged in" it. Williams v. Fanning, supra, 332 U.S. at page 493, 68 S.Ct. at page 189; Daggs v. Klein, supra. Certainly no mere subordinate bank which was itself subject to the jurisdiction of the Board has *the power or authority which must be exercised* to effectuate such a decree.

Jurisdiction to compel action of the character noted would therefore exist only where the Court had a personal jurisdiction over the Home Loan Bank Board members; a direct attack on the orders could only be made after personal service in the proper jurisdiction was had on the Federal Home Loan Bank Commissioner and upon the members of the Board. Attempting to compel such action by a subordinate bank notwithstanding the absence of Board approval, would certainly seriously interfere with the public administration and effective operation of the Home Loan Bank System, not only in California and the present Eleventh District, but throughout the nation. The entry of the decree sought by these plaintiffs might raise serious questions concerning the validity of consolidated debentures and would certainly impede the issuance of additional such securities. Title 12 U.S.C.A. § 1431(b).

We agree with appellants that without formal Board approval, the functions of the San Francisco Bank or a reconstituted Los Angeles Bank could be performed only with serious financial risk to the directors, a risk which responsible persons would certainly be reluctant to assume since they would be acting without Board sanction and without any sort of authority to be found in the Home Loan Bank Act. Our attention is not directed to any provision of that Act which would require the Board (under such a decree) to proceed to perform its statutory supervisory functions over a judicially "reactivated" Bank of Los Angeles precisely as though this bank had never suffered an interruption in its corporate existence. And nowhere in the Act is the ministerial duty imposed on the Board to restore the Los Angeles Bank or to return assets theretofore transferred to the San Francisco Bank even under such a decree.

A final consideration. Such a decree would seriously impinge upon the Board's continuing statutory duty to supervise the Federal Home Loan Bank System, for it would substitute Court's supervision for that vested in the Board by statute. In short, enforcement or attempted enforcement of such a decree would create confusion in the System of a kind difficult to measure because of its unprecedented character. We make further comment on these matters just below.

In making plain their own position on this appeal, appellees also argue that the Los Angeles Action is not a suit against the United States because Section 1655, supra, "is clearly a vehicle whereby *under general law,* within the meaning of the cases *typified* by Land v. Dollar, 330 U.S. 731 [67 S. Ct. 1009, 91 L.Ed. 1209], a party may litigate his claims to specific property. Such being the case, the Dollar decision and its prototypes stand as authority for the proposition that *any and all questions germane to the Los Angeles Bank's claim to its seized assets and properties* may be litigated in the Los Angeles Action and in the (bank's) cross-claim in the Mallonee action." It is said that this is true because Section 1655, supra, provides "the conventional type of action to determine conflicting rights or claims as to real or personal property within the jurisdiction *upon the basis of substituted service upon the parties outside the jurisdiction."*

The provisions of the Federal Home Loan Bank Act are not cited or relied on to support the fundamental theory which thus underlies the Los Angeles Action. Unless we are willing to ignore or set aside clear provisions of the Home Loan Bank Act we cannot agree that the Dollar case here relied upon provides a rule applicable to the unprecedented problems wrapped up in the

involved litigation of which the Los Angeles Action is a part.

We have heretofore held that Home Loan Banks are not private banking corporations but are public banking agencies of the United States and it is in light of that holding that we further examine the demands of Los Angeles which immediately concern the character of these banks. That Home Loan Banks are legislatively created institutions and that Congress set up a schedule of rules under which they came into existence and under which they are required to function as the price of existence, are conclusions we have accepted and adopted.

■ While Home Loan Banks are operated under carefully delimited private management, this fact in nowise militates against our view that they are governmental banking agencies. No constitutional limitations are suggested which forbid Congress to create this type of public agency to perform certain functions of a public nature within a limited area of the banking field under the regulatory limitations and restrictions set up in the Home Loan Bank Act, hence we do not doubt that such bank functions as are prescribed in the Federal Home Loan Bank Act are public and federal in their nature, and we so hold.

■ In dealing with the question of the indispensability of the United States as a party to the Los Angeles Action, little need be said. Despite the form of the Los Angeles Action we think that it is, in legal effect, a suit against the United States. And nowhere in the Federal Home Loan Bank Act does it appear that the Government of the United States had waived immunity to suit in an action which immediately involves the *status* as well as the creation and/or re-activation of Federal Home Loan Banks and Home Loan Bank Districts. Nor has the government waived immunity to suit involving the issue of control of their assets and the measure of administrative control over these banks exercised through a purely Congressional instrumentality—the Board. And, as we later emphasize, we are persuaded that a suit of the character just above mentioned would be a suit against the United States if brought against the Board. Furthermore, it

is clear that even if Congress had specifically provided a statutory waiver of sovereign immunity to suit in an action like that brought by Los Angeles, it could impose such conditions and restrictions as it chooses. Nichols v. United States, 7 Wall. 122, 19 L.Ed. 125; Luckenbach S. S. Co. v. United States, 272 U.S. 533, 536, 47 S.Ct. 186, 71 L.Ed. 394. But the Act does not waive sovereign immunity to suit in actions of the character above noted.

■ Where statutory consent to a suit against the sovereign is not given, the attempted exercise of judicial powers to adjudge against a sovereign is void. United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 514, 60 S.Ct. 653, 84 L.Ed. 894.

It also rests with Congress to determine not only whether the United States may be sued, but in which courts the suit may be brought. Where jurisdiction has not been conferred by Congress, no officer of the United States has the power to give any court jurisdiction of a suit against the United States. State of Minnesota v. United States, 305 U.S. 382, 388, 389, 59 S.Ct. 292, 83 L.Ed. 235. An issue of this character was injected into the case by an argument of Mallonee and Association. See our reference in Part five herein to cases discussing this particular problem.

■ Not only is the Home Loan Bank Act wholly silent as to the right of any Home Loan Bank to sue the Board, but Congress also carefully refrained from making the Board a suable entity. Furthermore, it is an unincorporated agency of the United States, itself without power to sue or be sued—the statute of the Board's creation gave no such consent. See United States Department of Agriculture, etc., v. Remund, 330 U.S. 539, 541, 542, 67 S.Ct. 891, 91 L.Ed. 1082. It is not at all strange that due to the nature of their banking functions it was necessary for Congress to confer upon Home Loan Banks the power to "complain and to defend, in any court of competent jurisdiction"—"to sue and be sued," 12 U.S.C.A. § 1432, but no authority was conferred upon such a district bank to defend in a suit where the clearly revealed purpose of the suit is to compel the local bank to perform, or attempt to perform, a

function which only the Board may lawfully perform. The equity powers of a federal court may not be invoked to sanction entertaining of a suit wherein a decree is sought which directs a bank to take action of that character. Congress has carefully withheld giving to any bank the power to perform Board functions even under the compulsion of a decree such as is here sought. See footnote 8, supra.

■ The "interest" of the federal government in the operation and function of Federal Home Loan Banks thus arises from a statutory relationship which is not to be measured in law only and alone by the amount of capital which the government may have invested in one of these banks at any given time. In the Los Angeles Action we not only have a demand for recovery of specific property over which the United States maintains the "legislative interest" of a continuing administrative control (through Board control of bank functions) but in this case we also face the fact that the United States had a financial stake (or "interest") in the Los Angeles Bank, as we have pointed out in Part three herein. See footnote 6½ supra. The Supreme Court has held that a proceeding against property in which the United States has an interest is a suit against the United States. See United States v. Alabama, 313 U.S. 274, 282, 61 S.Ct. 1011, 85 L.Ed. 1327; Maricopa County v. Valley National Bank, 318 U.S. 357, 362, 63 S.Ct. 587, 87 L.Ed. 834.

The authorities above cited will serve to indicate the very narrow range within which suits against the sovereign are permitted, regardless of the form in which such suits are brought.

What then is the *measure* and/or extent of judicial control which (under the unprecedented circumstances of this case) the lower court may lawfully exercise over the *status,* and property in possession of, any bank here involved? Here the lower court does not have personal jurisdiction over the Board, see footnote 7, supra, but in any event such jurisdiction is not considered by Los Angeles and appellees to be an essential ingredient of the litigation. While nothing to be found in the Home Loan Bank Act even remotely suggests or infers

that the Act confers jurisdiction on the lower court to enter a decree which would have the legal effect of *changing* the official (statutory) *status* of a bank the lower court appears fully persuaded that under the facts and the pleadings in the Los Angeles Action it may lawfully exercise this very measure of control. This is made evident by the record in this appeal and in the appeal in the main case.

To begin with, the lower court faces the fact that the Home Loan Bank of Los Angeles was formally *abolished* by the three 1946 administrative orders here in controversy. The purpose of the Los Angeles Action is to secure "restoration" of the former Bank of Los Angeles to its former *official status* within the Federal Home Loan Bank System. It seeks to accomplish this purpose solely through a decree of the lower court. It demands such a decree despite the fact that nowhere in the Home Loan Bank Act is there a semblance of authority for the lower court to make and enforce a decree of this character, this because such functions are specifically reserved by Congress to the Board. The orders in question were valid on their face for they dealt with matters and acts clearly committed by law to the control and supervision of the (then) Commissioner (Fahey). In making the orders Fahey did not purport to act as an individual—he was acting as an official performing a function within the statutory scope of his official powers. Fahey was a statutory administrative agent of Congress. The real significance of the Federal Home Loan Bank Act lies in the fact that by this legislation Congress made sure that *it* retained permanent control over the nationwide bank system it created in 1932. The delegation of authority to Fahey thus came directly from Congress and from no other source.

■ We are convinced that the 1946 Los Angeles suit against Fahey (Administration) being a suit against *official action* of a servant and agent of Congress, was in truth and in substance a suit seeking relief against the United States in its sovereign capacity. This fact made it necessary that Los Angeles bolster its claim for equitable relief by demanding that the court "go back

of the orders" and "scrutinize the activities" of Commissioner Fahey which were charged to be motivated by malice. Obviously the court did "scrutinize" the alleged malicious "motives" of Commissioner Fahey, but we think the contention as to the presence of "motives" loses legal force as an argument. We agree with appellants that allegations that improper motives prompted the promulgation of the challenged orders, that their purpose was "wholly punitive and disciplinary and not otherwise," do not permit a collateral attack upon the validity of the orders through means of which these orders are subjected to an impermissible form of judicial review in an action of the basic character of the Los Angeles Action. For "if the order is justified by a lawful purpose, it is not rendered illegal by some other motive in the mind of the officer issuing it". Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 410, 81 L.Ed. 562. And see our comments on this point of law in our opinion in the main case, 196 F.2d 336, 380, and cases cited.

In this posture of the case it is evident that the specific "relief" which Los Angeles demands at the hands of the court would, to be effective, necessarily require the court to enter a decree which on its face "reactivated" the Bank of Los Angeles within the Federal Home Loan Bank System and this without *any action on the part of a Congressional legislative agent—the Board*. In light of the clear provisions of the Home Loan Bank Act it is impossible to view such a transition in the *status* of this abolished bank as being legally possible of accomplishment without official administrative action by the present Board.

But other practical considerations intrude. We are quite persuaded that if the decree sought by Los Angeles is to be effective in providing all of the relief it demands and wrap up all pertinent issues in one package in accordance with the best traditions of equity practice, it would have to go further and blot out of existence the administratively created Home Loan Bank of San Francisco—certainly an "effective decree" would have to eliminate the corporate existence of the Bank of San Francisco otherwise it would be left to later assert the

claim that under the decree *it still retained a valid corporate existence as a Home Loan Bank*. Unless such a possible claim was also extinguished by the decree the resulting uncertain official status of the San Francisco Bank would remain as a basis for its later assertion of the very claims it is here asserting. Even the assertion of such a claim would create a chaotic situation within the Federal Home Loan Bank System of the United States.

No suggestion is advanced by Los Angeles or appellees as to how that sort of a situation would or could be avoided or eliminated, or what *disposition* should and would be made of the corporations known as the Federal Home Loan Banks of San Francisco and Portland. If the decree of the lower court "re-activates" the former Bank of Portland, then former (1946) assets of that bank now merged with assets claimed by the Bank of San Francisco, must somehow be segregated and returned to the re-activated Portland Bank, or Los Angeles would be denied part of the full relief it demands and which it asserts must and should be granted. Surely Los Angeles could not be "restored" and thereafter be permitted to retain possession of any part of the assets in possession of the former Bank of Portland at the time it was abolished in 1946.

These and allied considerations raise vital legal and administrative problems of grave significance and reveal but a few of the involvements and complications suggested by the specific demands of Los Angeles. They tender inescapable issues and they may not, and should not, be disregarded unless we are willing to leave unsettled aspects of and issues in this equity action which would surely inspire more litigation. The very least that can be said is that they are so important that they should not be left to conjecture or speculation in an equity suit which rests on the theory that *all matters in dispute* are to be, and would be, eliminated by the decree. The *legal existence* of the Home Loan Bank of San Francisco and the former Bank of Portland are very much "a matter in dispute" *if* the Los Angeles Action means anything. The presence and pertinence of these troublesome issues

persist as one of the dominating facts which gives significant character to this extensive litigation. At a later point we refer more specifically to other and allied phases of the same problems.

We can find nothing in the Federal Home Loan Bank Act, nor has any provision therein been cited to us, which by the most tortured construction would grant jurisdiction to the lower court to "re-establish" or "re-activate" the Banks of Los Angeles and Portland *and* blot out of existence (or alternatively ignore the corporate existence of) the present Bank of San Francisco. Yet viewed both realistically and technically that is exactly what the suit of Los Angeles really calls upon the lower court to do, and this in face of the fact that readjustment of bank districts and the necessary steps to accomplish such purposes are functions and matters exclusively committed by statute law to the discretion of the Board. But since Los Angeles and appellees posit their case on the assumption that the lower court has "plenary jurisdiction" under the form of the Los Angeles Action to order the changes we have suggested, and this in the absence of any kind of administrative Board action, we consider it necessary to outline what we think the court would have to direct in its decree in order to give to Los Angeles *all* that it demands.

If it was to restore (as demanded) the status quo ante in the here involved Pacific Coast area of the Federal Home Loan Bank System, the decree would (as a necessary minimum) have to order, direct and approve: (a) restoration and re-activation of the Home Loan Banks of Portland and Los Angeles; (b) abolition of the Home Loan Bank of San Francisco; (c) re-establishment and re-activation of the Home Loan Bank Districts of the entire Pacific Coast area as they existed prior to the making and enforcement of the three Board orders of March 29, 1946 by a redivision of the present Eleventh District into two Districts, since under the law here involved there can be one and only one bank to a District; (d) the appointment of necessary public directors for the new (court) recreated banks in Los Angeles and Portland; (e) budgets for these banks; (f)

the supervision of such further procedural steps as would bring about a transfer of the now scrambled title to assets claimed by each of these banks, past and present. (It may be assumed that the "supervision" here referred to would be given by a special master under directions from the court since a court is not equipped to personally supervise the involved accounting procedure that would be necessary.)

A decree which did not purport to accomplish the steps and changes just above noted would deny the essentials of the relief specifically demanded by Los Angeles and leave it the target of potential demands not eliminated by the decree—demands which in our judgment would have a statutory basis. Los Angeles is now in a position where it cannot have the lower court stop at a half-way point in the granting of full "equitable relief"—it cannot achieve judicial "restoration" or "re-activation" of the Los Angeles Bank unless at the same time the court "does something" in the decree about *the corporate existence* of the former Bank of Portland *and* the present Bank of San Francisco. That "something" is the judicial disposition of these subordinate elements in the Home Loan Bank System, and certainly that vital problem cannot be shunted to one side as utterly irrelevant to any real issue in the case. A decree granting the demands voiced in the complaint in the Los Angeles Action would leave these two corporate entities dangling in mid-air after the lower court *transferred* the assets of San Francisco to the recreated Bank of Los Angeles. Perhaps Los Angeles assumes that the problem of the future *status* of the Banks of San Francisco and Portland is of no legal consequence, or is properly to be left to some future administrative action by the Board.

Whatever the theory of Los Angeles (and we are measuring what we conceive to be its theory by the demands in its complaint) we can find no justification for assuming that the lower court has jurisdiction to hereafter enter and enforce a decree of the character sought by Los Angeles, and certainly no jurisdiction to enter and enforce a decree which left the Banks of Portland and San Francisco wandering about in

some corporate "no man's land" with a *status* impossible to define by any legal standards suggested by the parties or to be found in the Home Loan Bank Act.

We are also assured by appellees that the relief demanded by Los Angeles does not call for *setting aside* the reorganization orders of 1946 as in a case where an orthodox type of judicial review of administrative orders is demanded. As to this particular matter they contend that if the "relief" demanded "goes too far" in asking that the three Board orders be declared "null and void," an objection would relate *merely to the form of the equity decree to be rendered.* So it is obvious that Los Angeles discards all of the orthodox conceptions of formal judicial review of final administrative orders on the theory that the decree need not direct (and will not direct) the Board to take any sort of administrative action on the orders of March 29, 1946; the court will simply declare them null and void and the decree demanded will have the legal effect of retroactively stripping them of force and effect. In short, the Board is not to be called upon to play any part in the procedure under and by means of which Los Angeles regains its former *status* in the Home Loan Bank System.

In viewing the foregoing contentions (which are advanced on behalf of both the appellees and Los Angeles), we think it apparent that an examination of the provisions of the Federal Home Loan Bank Act would at once suggest the necessity of formal Board action of an official character if the 1946 orders of "Administration" which abolished the Bank of Los Angeles are to be lawfully set aside. We are quite convinced that the present Board may not be ignored, and we are also convinced that Board action would be necessary unless we are willing to utterly disregard all pertinent regulatory provisions of that Act, or openly and frankly read them out of the legislation. No cases are cited, and none are to be found which could possibly justify or sanction such drastic action on our part, and certainly the language of the Federal Home Loan Bank Act vigorously repels the idea that the Board may be utterly disregarded in disposing of the vitally important issues

here presented without suing the Board and/or its members in a federal court where service of the process of that court would at least give the court personal jurisdiction over the Board and its members. See Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410; Queens County Group of Savings and Loan Associations v. Home Loan Bank Board, D.C., 104 F.Supp. 396 and same case in, D.C., 106 F.Supp. 504. And see cases cited in footnotes 7 and 23.

We have examined the cases relied on by Los Angeles and appellees and we do not agree that the rationale of the cited cases sustains the basic contentions of these appellees in this and in the main case. We are convinced that the Los Angeles Action is by its very nature an unconsented suit against the United States. It is directed against the Federal Home Loan Bank of San Francisco which we have held to be an agency of the United States. Its real purpose was to compel definite action by this subordinate agency—action which we regard as *official action* which only the Board could take, thus giving the Los Angeles Action all of the essential characteristics of a suit against the United States which cannot be maintained except with its consent which is here withheld. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; American Dredging Company v. Cochrane, 89 U.S.App.D.C. 88, 190 F.2d 106; Seiden v. Larson, 88 U.S.App.D.C. 258, 188 F.2d 661.

So far as the record shows, a controversy of this particular character has never confronted the federal courts although the legislation here considered has been on the books since 1932. Through all these years Congress has seen fit to retain the plenary administrative controls it set up in the Act, an attitude which probably finds its reason in the distressing and unforgettable experiences of the depression of the 30's which called for aggressive legislative steps to alleviate the financial miseries and tragic economic plight of vast numbers of home owners throughout the nation. And it is worthy of note that Los Angeles and appellees do not challenge the constitutionality of the Federal Home Loan Bank Act. It

is more than arguable that if the forms of administrative and legislative control it set up over one small and highly specialized type of banking activity is distasteful to Congress and to the American people our national legislature would have long since changed the rules or wholly abandoned this narrow field of banking legislation.[10]

Our views concerning the phase of the case considered in this Part of our opinion call for the conclusion (1) that the lower court did not have jurisdiction in personam over the Commissioner under the substituted service of 1946 (see footnote 9, supra); (2) that the lower court does not have jurisdiction in personam over the (present) Board; (3) that the lower court may not lawfully command the subordinate Bank of San Francisco to perform acts which (under the clear provisions of the Home Loan Bank Act) the Board alone is authorized to perform; (4) that the yet untried Los Angeles Action is an unconsented suit against the United States; (5) that the "specific relief" demanded in the Los Angeles Action may not lawfully be granted by decree or judgment of the lower court and the lower court is without jurisdiction

to grant such relief; (6) that neither the Bank of San Francisco nor the Bank of Portland is in law the alter ego of the Board, and neither of these banks may lawfully be commanded or required by decree or judgment of the lower court to perform acts and functions demanded in the complaint of the Federal Home Loan Bank of Los Angeles, since such acts and functions may only lawfully be performed by the present Board.

The pleadings in the Los Angeles Action set forth a demand for a form of relief which the lower court has neither the power or jurisdiction to grant, and which relief is barred by the provisions of the Federal Home Loan Bank Act. Under the facts and the law and for reasons set forth in this opinion, we are obliged to hold, and do hold, that the lower court was without jurisdiction of the subject matter of the Los Angeles Action and without jurisdiction in personam over indispensable parties in and to such an action. The lower court improperly entertained this action which should have been dismissed when the Commissioner challenged the jurisdiction of the court.

10. As a side-light on the question of the regulatory "powers" of the Board we noted in our opinion in the main case (12,511) that counsel for the Long Beach Federal Savings and Loan Association (Association) and its shareholder-members (Mallonee) attach significance to the recommendations contained in a report of a Select Committee of the House of Representatives (House Report No. 2659, 79th Congress, 2nd Session, dated July 25, 1946). The report was made pursuant to House Resolution 88 to investigate executive agencies, and related to the actions of the (then) Federal Home Loan Administration (now the Board) and the complaint of the Federal Home Loan Bank of Los Angeles and Association, which matters were the subject of our opinion in the main case. See footnote 20 in that opinion. 196 F. 2d 390. This reference is made because counsel for Association, Mallonee and Wilmington have filed briefs in this appeal in which this committee report is again suggested as having a bearing on the issues here presented.

It is not suggested by counsel that amendatory legislation has changed or restricted the scope and extent of the regulatory powers of the Board as the result of this committee report, or at all, and we must therefore assume, and do assume, that the (here challenged) powers of regulation conferred on the Board are still recognized and approved by Congress as providing a satisfactory system of control over the functions of the component parts of the nation-wide system it created.

That the administrative action complained of on this appeal and in the main case is generally legislative and political in character is strongly indicated by the fact that all of the complaining parties in this long litigation have placed in the record on this appeal (and in the appeal in the main case) evidence of applications to Congress for the same relief sought here. Two separate hearings on these applications were heard before Congressional Committees. We referred to the report of the Congressional Committee made after the first hearing in footnote 20 to our opinion in the main case; 196 F.2d 390; apparently the report of the Committee on the second hearing has not yet been published.

While our conclusion is that the Los Angeles Action was improperly entertained by the lower court and must be dismissed for lack of jurisdiction, there are other important phases of this involved litigation which inject issues calling for consideration, and in our view require disposition on this appeal because of their intimate relationship to and dependence upon contentions advanced in the Los Angeles Action. Because of the involved nature of the entire body of litigation it seems both desirable and necessary to eliminate, as far as possible, such doubtful questions as come legitimately within the orbit of the instant appeal. It will serve the interests of all of the litigants to pursue this course.

Mallonee and Association have filed briefs on this appeal in behalf of the claims of appellees in which they also vigorously contend that all association members of Los Angeles were ruthlessly despoiled of their "property rights" in the Bank of Los Angeles by the transfer of their membership to the Bank of San Francisco and the transfer of assets in possession of the Bank of Los Angeles to the Bank of San Francisco. Based primarily on such claims Association has demanded judgment for damages against all defendants in the main case, which, in the aggregate, amount to enormous sums.

Questions as to liability under the claims of Association thus appear to be inseparably related and linked to the controlling issues in the Los Angeles Action. As an example, see portion of Association's contentions set forth in a pleading filed on or about January 12, 1948 at pp. 3309 to 3314 in the printed appeal transcript in the main case. And see also demands for judgment in a Supplemental Cross-Claim of Association (filed on or about May 28, 1948 in the main case, pp. 4161 to 4332 of printed appeal transcript) which elaborates the former pleading and specifies the nature and extent of damages claimed by Association.

Aside from a disposition of the question of attorneys' fees which is the subject matter of the instant appeal, these remaining problems urged upon us have to do with the validity of the above noted claims of Association relative to deprivation of "property rights," and the problem of judicial review of administrative orders as related to the Los Angeles Action. They are considered at this point.

## V

The Position of Association and Mallonee on Issues in the Los Angeles Action and Those Presented in the Instant Appeal

The Long Beach Federal Savings and Loan Association (Association) and "Mallonee" (Shareholder members of Association) have filed a joint brief on behalf of appellees in which they urge that the order on appeal be affirmed and the instant appeal be dismissed. While their arguments deal with the contested allowance of interim attorneys' fees to appellees much space is also devoted to a vigorous reiteration of their contentions in the main case. In this part of our opinion we shall refer to their joint contentions as those of Mallonee-Association.

As respects the impounded funds from which the contested fees were ordered paid, Mallonee-Association assert that *appellees* in the instant appeal "have participated in" the interpleader actions or proceedings "on their behalf and for their benefit"; that pursuant to these proceedings in interpleader, or in the nature of interpleader, the assets were impounded in the registry of the court.

Attention is directed to an order of the lower court entered on June 19, 1950 where the court said (in part) that this "extremely complex litigation" has been pending since May 27, 1946; that all parties have proceeded with diligence and good faith to bring the multiple claims among the numerous parties in the action in chief to issue; that the entire litigation is proceeding in one phase or another almost daily and requires constant attention of counsel; that the lower court (by various orders) has repeatedly rejected objections to the payment of the fees involved on this appeal, and no appeal was taken from these adverse orders; that in this posture of the litigation "it appears that it would be an abuse of discretion and a denial of the right to counsel (for Los Angeles and its co-plaintiff Wil-

mington in the Los Angeles Action) to grant a stay of the order allowing the attorneys' fees here in issue (except upon certain conditions not here material).

Mallonee-Association also note that the lower court found that counsel for the Bank of San Francisco have received a sum of approximately $100,000 to defray legal expenses and attorneys' fees for resisting "plaintiffs' claims" (in the entire litigation). This finding was made in connection with the order here on appeal. It is pointed out that this expenditure was not approved by the court.

It is also pointed out that on July 6, 1948, Association filed a petition and motion in the lower court which avers that the Los Angeles Action "was brought in good faith and on reasonable grounds." These 1948 documents set forth "that holders of shares representing more than ⅔ of the 'voting power' of the purported San Francisco Bank have voted to dissolve said San Francisco Bank, if it ever existed." The record shows an objection of appellants to use of this petition and motion as evidence in justification of the payment of the attorneys' fees which are the subject of this appeal. It was urged that this kind of evidence was wholly irrelevant and incompetent because there is no provision of law under which a Federal Home Loan Bank may be dissolved by a vote of its (association) member stockholders. Dissolution of a bank is an administrative function which, under express provisions of the Federal Home Loan Bank Act, *may only be exercised by the Board.*

The lower court permitted the petition and motion to be introduced "solely to substantiate the claim of the movents here (appellees on this appeal) for fees on the ground that they acted in good faith" (for their clients in the Los Angeles Action) and stated that to either sustain or overrule appellants' objection would decide the lawsuit on its merits.

In summary, it may be said that the Mallonee-Association brief makes plain that as to all essential issues *in the entire litigation* both of these parties completely disagree with the conclusions we express in Parts three and four of this opinion. As to the instant appeal they reiterate arguments of appellees regarding the "good faith and reasonable grounds" claimed to underlie the defense of Los Angeles in resisting the three administrative orders of March 29, 1946. They assert that the right to "sue and be sued, to complain and to defend" granted to the Los Angeles Bank, 12 U.S. C.A. § 1432, can not be cut off by operation of the orders under challenge, and assert that no concurrence or action on the part of *any* of the appellants is required for the payment of the attorneys' fees here involved. In short, the impounded funds are a "trust fund"; the court may properly allow attorneys' fees to beneficiaries suing or defending *regardless of the ultimate outcome of the litigation because* the beneficiaries acted "in good faith and upon reasonable grounds." (The lower court so found.)

Based on Gugas v. American Surety Co., 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720, Mallonee-Association make the flat argument that "once the judgment requiring deposit of such assets into the registry of the court has become final and has been complied with, *their can be no further questions as to the jurisdiction or power of the court over such interplead assets.*" It is said that "The power of the court in interpleader over the assets of the San Francisco and Los Angeles Banks (thus) became final and res judicata upon expiration of the time for appeal *from the order interpleading the assets.*" (For text of the order of impound and reference to proceedings related thereto see comments at conclusion of Part one of this opinion.)

The argument just above noted rests upon the assumption (except as noted below) that the problem of jurisdiction over the funds must be resolved adversely to the claims of appellants by reason of the order of interplead of the funds. So far as concerns the basic and controlling issue in this appeal this is but another way of asserting that notwithstanding (1) total absence of personal jurisdiction over the Board; (2) the persistently maintained contention of appellants that the court wholly lacked jurisdiction over the subject matter of the Los Angeles Action and (3) without any administrative action by the Board, the

lower court had, and has jurisdiction, under the interpleader proceedings, to make and enforce a decree (1) which affects the *statutory status* of Home Loan Banks to the extent of modifying or changing their *statutory control* over assets and properties lawfully in their possession or to which they are or may be lawfully entitled, *including* the lien rights of San Francisco (under the Association notes executed by Conservator Ammann during his tenure as Conservator—see footnote 14) on the disputed assets impounded under the order of the lower court, and (2) which accomplished such a purpose despite the absence of any provision in the Federal Home Loan Bank Act granting, or purporting to grant or confer, such jurisdiction.

But Mallonee-Association go further in dealing with this phase of the problem of jurisdiction. They also add that the court below "has jurisdiction in interpleader, *and otherwise*," over the impounded funds. The "otherwise" is said to be "the inherent power" of a court of equity to allow the here challenged attorneys' fees "as fair justice to the other party will permit."

Cited as a "leading case" to support their equity theory of jurisdiction is Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. Also relied on as a "leading case" is Monaghan v. Hill, 9 Cir., 140 F.2d 31, 32 involving the tangled affairs of a Utah corporation, the "Intermountain Building & Loan Association". Other cases cited are Crump v. Ramish, 9 Cir., 86 F.2d 362, which dealt with an equity receivership proceeding involving the Sunset Oil Company; Tracy v. Spitzer, etc., 8 Cir., 12 F.2d 755; Glidden v. Cowen, 6 Cir., 123 F. 48; and Dee v. United Exchange Bldg., 9 Cir., 88 F.2d 372, dealing with a corporate reorganization proceeding

under the Bankruptcy Act where the question of fees for the reorganization manager and his attorney was involved.

In our opinion the fact situations revealed in the cases cited in the preceding paragraph make the reasoning in these cases inapplicable to the situation confronting us.

 Mallonee-Association advance an additional argument on the issue of jurisdiction. It is urged that "the court has *personal jurisdiction* to allow attorneys' fees *by express agreement of the Attorney General of the United States* [in a letter in which he stated] that 'any further attorneys' fees shall be judicially determined in an adversary proceeding * * *,' which agreement was filed with the Court below and relied upon by the Court and counsel." No cases are cited to sustain the theory that an agreement made with a government attorney during a period when negotiations were underway looking to a possible settlement of the litigation by some sort of a compromise, could confer on the lower court jurisdiction to make and enter a decree which would, in the absence of personal jurisdiction over the Board and its members, change and/or modify *the statutory control* of San Francisco over assets and properties of the bank here represented by its claim of lien (under the notes of Association) upon the impounded funds. Provisions of the Federal Home Loan Bank Act are not cited or relied on by Association to sustain this contention. See reference supra to State of Minnesota v. United States, 305 U.S. 382, 388, 389, 59 S.Ct. 292, 83 L.Ed. 235.[11] Cf. Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; Lee Wilson & Co. v. United States, 245 U.S. 24, 32, 38 S.Ct. 21, 62 L.Ed. 128; State of Utah v. United

11. The question of jurisdiction of the court to order payment of certain "interim" attorneys' fees to counsel for complaining parties in this litigation was brought into this case because of negotiations (in 1948 and 1949) for settlement and compromise of the entire litigation. In his brief in the main case (filed February 24, 1951) counsel for Association points out that the lower court made an interim award of $540,000 to four separate firms of attorneys representing different groups of the complaining parties. This order of award (which appears to have been made in April of 1949) was later vacated and supplanted by a new allowance of interim fees. We gather from the brief that there has been paid (as of its date) a total of $213,000 on account of attorneys' fees and approximately $50,000 on account of expenses—a grand total of $263,000.

To the foregoing total figure must be added a total of $60,000 allowed at vari-

States, 284 U.S. 534, 545, 546, 52 S.Ct. 232, 76 L.Ed. 469; United States v. San Francisco, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L. Ed. 1050; United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889. And see provisions of Title 12 U.S.C.A. Section 1430(c, d) concerning notes of "borrowing members" given to secure "advances" from Home Loan Banks.

As further emphasis on their right to "equitable relief" a finding of the lower court in the main case is cited which recited, inter alia, that *all* of the assets and properties (in the impound) are physically within the Southern District of California and thus physically within the jurisdiction of the Court. It is said that this finding is final and conclusive since no appeal was taken therefrom and that the absence of an appeal left *the issue* in this case to be: who owns and who is entitled to possession of these assets as between the Bank of San Francisco on the one hand and Los Angeles and Association on the other.

As to the problem of "indispensable parties" Mallonee-Association assure us that the lower court "did not need appellants' consent nor any personal jurisdiction over appellants when the court makes an order to the court's own clerk to pay out funds in the registry of the court." It is said that the logic of Williams v. Fanning, supra; Hynes v. Grimes Packing Co., supra, proclaims that appellants (including the Board *"are in no sense indispensable."* "If the act is unconstitutional, unlawful, and unauthorized, it can only be the individual act" of appellants and not an act of the United States—appellants may not hide behind immunity of the United States to prevent "an inquiry" by the court into these matters. It is urged that what appellants are really trying to do by their several appeals in this litigation is to escape a "full

hearing" on the merits in the court below, this despite their failure to appeal from previous judgments "disposing permanently of portions of the litigation." This argument assumes that in issuing the three reorganization orders of March 29, 1946 the (then) Administration acted in defiance of some provisions of the Federal Constitution and the making of the orders was an "unlawful act."

In support of the conclusions stated in the preceding paragraph relating to the necessity for a prior disposition of issues on the merits in the trial court, Mallonee-Association cite (among other cases) Montgomery Ward & Co. v. Langer, 8 Cir., 168 F.2d 182, 186, which holds that "A suit cannot properly be dismissed as not involving a controversy *within the jurisdiction of the court* unless the facts of record create a legal certainty of that conclusion." (Emphasis ours.) Under the theory here relied on and announced in the Langer case, the issue of *jurisdiction* of the lower court to entertain the Los Angeles Action and adjudicate the issues raised by its various pleadings is again thrust to the front as the dominating issue in that action.

The argument which serves to give impressive character to the Mallonee-Association arguments on this appeal is the emphatic accent on the factor of (association) "ownership of property, the right to corporate existence, stockholders' rights in a corporation [Los Angeles Bank] which *they* organized and created." The instant appeal requires a decision on this issue since it is not only of vital concern to all parties in the litigation but it reaches to the heart of the Los Angeles controversy which has been before the courts since May 29, 1946. The issue thus tendered takes form in the vigorous contention that association members of the former Bank

ous times and in various amounts to the Special Master. Orders making these allowances, or some of them, are the subject of appeals now pending in this court. Thus the total of all allowances would be $323,000, a figure subject to check against the long record.

The record indicates that in or about October, 1949, the negotiations were abandoned because a basis of settlement acceptable to the Board could not be

reached. It finally concluded that the (Los Angeles) bank litigation was so intertwined with the Association case that a separate settlement was impossible during the pending litigation. Damage claims running into millions of dollars had been asserted by Association in its supplemental cross-claim filed in 1948 and were (and are still) being maintained.

of Los Angeles had "a property right" in the continued existence of that bank, and that the challenged orders of 1946 "confiscated this property right" by the *transfer* of the assets and properties in possession of Los Angeles to the "purported" Federal Home Loan Bank of San Francisco.[12] On this basis they relate the contention to the immediate issue of payment of interim attorneys' fees to counsel for plaintiffs in the Los Angeles Action.

Before disposing of the issue just above noted it is necessary to indicate the place and status of associations in the overall scheme of legislation represented by the "Federal Home Loan Bank Act", and the "Home Owners' Loan Act of 1933", Title 12 U.S.C.A. § 1461 et seq.

Since we here concern ourselves with "*Federal* Savings and Loan Associations" (those "similarly situated" in the two "class actions" here involved) attention is directed to Title 12 U.S.C.A. § 1464(a) which authorizes the Board to "provide for the organization, incorporation * * * operation, and regulation" of such (federal type) associations, and to "issue charters" to them. Under Section 1464(f) "Each such [Federal] association" *automatically* becomes a member of the Federal Home Loan Bank of the district in which it is located (unless the Board approves membership in a bank in an adjoining district); in becoming a "member" it must *qualify* for membership "in the manner provided in" the Federal Home Loan Bank Act.

Under Section 1464(h) *federal* associations, including their franchises, capital, reserves, and surplus, and their loans and income are exempted from all taxation imposed by the United States except taxes imposed under Title 26 with respect to wages paid after December 31, 1939. *All shares of stock in federal associations* are exempted, both as to their value and the income therefrom, from *all taxation* (except surtaxes, estate, inheritance, and gift taxes) imposed by the United States. State and local taxing bodies are forbidden to impose any tax on these federal associa-

tions or their franchises, capital, reserves, surplus, loans, or income greater than that imposed by such taxing authorities on similar local mutual or cooperative thrift and home financing institutions.

Upon request of the Board it became the *duty* of the Secretary of the Treasury to subscribe for "preferred shares" of stock in "such associations", Section 1464(g), up to $100,000; under Section 1464(j) the Board may require a similar subscription for "full paid income shares" and the association may call for payment for such shares "from time to time," subject to approval by the Board and the Secretary. *Request* (to the association) to repurchase the government-held *full paid income shares* shall not be made by the Secretary for a period of five years from the date of the purchase by the Secretary.

"Such associations" are required to make provision for the "retirement" of the *preferred shares* held by the Secretary, and to this end begin, at the expiration of five years from the time of government investment in such shares, to set aside certain receipts of the association for the purpose of "retiring" this stock, Section 1464(g).

And as evidencing the further interest of Congress in "local thrift organizations" (including those of the "Federal" type) see Section 1465 of Title 12, Chapter 12 U.S.C.A. Large appropriations were authorized by Congress to implement and underwrite a comprehensive legislative program through which the federal government gives financial aid and encouragement to local thrift and local home financing associations.

Among the privileges which make statutory membership in a Federal Home Loan Bank a valuable asset to *Federal* Savings and Loan Associations is the right to secure "advances" from its district bank, Title 12 U.S.C.A. §§ 1429, 1430, and these associations also share in dividend distributions by the bank without preference. Section 1426(k).

The foregoing references to provisions of statute law fairly serve to illustrate the

---

12. Many types of organizations operating in the home financing field are authorized to subscribe for stock in, or as non-member borrowers of, a Federal Home Loan Bank. Consult Title 12 U.S.C.A. §§ 1422, 1424, 1442, 1444, 1447, 1464.

close financial relationship existing between the federal government and 1500 Federal Savings and Loan Associations operating under Board charters [13] without which they could have no existence. They spell out with clarity and emphasis the many special privileges and advantages these associations enjoy; these advantages are the product of a legislative scheme which gives an association a peculiar status under the law of their being. Undoubtedly these facts, together with the overall system of federal regulation through the Board, caused the Supreme Court to characterize them as institutions conducting "a public banking business on certain limitations".[14]

In their brief appellants point out that prior to consolidation of the Eleventh and Twelfth Federal Home Loan Bank Districts, the associations of Southern Cali-

13. According to testimony given before a Congressional Committee on June 26, 1951 by William K. Divers, Chairman of the Home Loan Bank Board.

In their brief Mallonee-Association state that the former Los Angeles Bank had 172 stockholder association members at the time of the consolidation of the 11th and 12th Federal Home Loan Bank Districts.

In testimony given on December 14, 1950 before the above mentioned Congressional Committee, William F. McKenna, Assistant General Counsel of the Home Loan Bank Board, stated that (as of that date) "the total eleventh and twelfth regions have 310 associations in them. The former eleventh region has 127 and the former twelfth region has 183, making a total, as I say, of 310 associations in the combined eleventh and twelfth regions."

The former Federal Home Loan Bank of Los Angeles was organized and established within and for the Twelfth Federal Home Loan Bank District created by the Federal Home Loan Bank Board under the Bank Act and included in the Twelfth District were the states of California, Nevada, Arizona and the Territory of Hawaii. The former Federal Home Loan Bank of Portland, with its office in the city of Portland, State of Oregon, was the bank for the Eleventh Federal Home Loan Bank District, and included within that District were the states of Oregon, Washington, Idaho, Utah, Montana, Wyoming and the Territory of Alaska. By the three administrative orders here under challenge which were issued on March 29, 1946, the Federal Home Loan Bank of Los Angeles was dissolved and said Twelfth Federal Home Loan Bank District was consolidated and merged with and became a part of said Eleventh District and at the time of said consolidation and reorganization, the name of said Federal Home Loan Bank of Portland was changed to the Federal Home Loan Bank of San Francisco, and the principal of-

fice of said Bank was moved to the City of San Francisco, State of California, and said Consolidated District was thereafter and is now known as the Eleventh Federal Home Loan Bank District, composed of the States of Oregon, Washington, Idaho, Utah, Montana, Wyoming, the Territory of Alaska and the States of California, Nevada, Arizona and the Territory of Hawaii. See pp. 4121 to 4123 printed transcript in main case, 12,511.

14. Some highly pertinent observations of the Supreme Court in Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 1557, 91 L. Ed. 2030, shed valuable light on the status of Association under the Home Owners' Loan Act of 1933. The court carefully pointed out that Association was operating under a charter granted by the Act "under which it has its existence" 332 U.S. at page 255, 67 S.Ct. at page 1557 and that Congress had endowed this institution "with the right to conduct *a public banking business* on certain limitations"; that "it would be intolerable" that the Congress "should endow an Association with the right to conduct a public banking business on certain limitations and that the Court at the behest of those who took advantage from the privilege *should remove the limitations intended for public protection.*" The court goes on to point out that "It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act to gain advantages of corporate existence *is estopped from questioning the validity of its vital conditions.*" (332 U.S. at page 256, 67 S.Ct. at page 1557—Emphasis ours.)

And see our comments on the validity of the appointment of Ammann as conservator of Association appearing at the end of Part one of this opinion. It was during his tenure as conservator that Ammann executed and delivered the notes of Association to the Federal Home Loan Bank of San Francisco to evidence a loan from that Bank to Association.

fornia had been in a position to elect at least half of the Board of Directors of the former Los Angeles Bank of the Twelfth District. That loss of power is heavily stressed in two pleadings filed in the Los Angeles Action. That this loss of voting power in the election of directors resulted from the readjustment of the Eleventh and Twelfth Federal Home Loan Bank Districts is apparent. We are in agreement with the government that loss of power to elect at least half of the Board of Directors of Los Angeles did not result from the transfer of assets *from* the Los Angeles Bank *to* the San Francisco Bank. This is all the more evident from the obvious fact that the effect on the *power* of the California associations would have been identical if, upon the consolidation of the two districts, the Portland Bank had been dissolved and its assets transferred to the Los Angeles Bank, and the latter, retaining all its assets, thus had become the bank for the consolidated district.

■ But in any event, under Section 3 of the Federal Home Loan Bank Act, Title 12 U.S.C.A. § 1423, readjustments of districts *by the Board* are specifically authorized, and we think that exercise of the authority thus granted to readjust bank districts is the exercise of a purely governmental power in which no association has a justiciable interest. Town of Mt. Pleasant v. Beckwith, 100 U.S. 514, 25 L. Ed. 699; Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151; Commissioners of Laramie County v. Commissioners of Albany County, 92 U.S. 307, 23 L.Ed. 552.

That the lower court is fully convinced that the Board lacks authority to readjust districts without some sort of consent from or permission of Home Loan Banks affected by such readjustments, is made evident by a finding which accompanies the order here on appeal. In this finding the court specifically stated "that on said date [March 29, 1946] said assets [of Los Angeles] were purportedly transferred by certain defendants to said Portland Bank without any consideration *to* the Los Angeles Bank *or* any of its member stockholders *and* without any resolution by the Portland Bank requesting permission to acquire any assets of the Los Angeles Bank *and* without any resolution or request of the Portland Bank to assume any of the liabilities of the Los Angeles Bank. That simultaneously with said seizure the name of the Portland Bank was purportedly changed to the Federal Home Loan Bank of San Francisco by the Federal Home Loan Bank Administration."

■ If the legal theory upon which the lower court acted in making this finding is sound law, it is obvious that the readjustment of bank districts could not be ordered by the Board without "consideration" passing to an abolished bank and its stockholders, and without the formal "resolution" or "resolutions" suggested in the finding. We are unable to agree that provisions of the Home Loan Bank Act sanction or authorize such drastic judicially imposed restrictions on the administrative authority of the Board. It is clear from the Act that readjustment of bank districts is a purely administrative function committed to the discretion of the Board and not to the courts. Any other view would require us to ignore the plain and unambiguous terms of the Act.

■ We are unable to agree with Mallonee-Association and Los Angeles that because the prior districting of banks gave California associations the power to elect at least half of the directors of the former Los Angeles Bank this circumstance created a justiciable right to the continuance of such voting power in the California associations. The Home Loan Bank Act denies such a right. Nothing in the Federal Home Loan Bank Act requires the consent of any bank *or* its member associations to readjust districts, and of course in any readjustment of districts there would be an inevitable change of voting power. The conclusion must therefore be that the loss of voting power of the Southern California associations was not the result of the invasion of any legally protected right. Alexander Sprunt & Son v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832; Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 147, 148, 44 S.Ct. 72, 68 L.Ed. 216; United States v. Merchants' & Manufacturers' Traffic Ass'n, 242 U.S. 178, 188, 37 S.Ct. 24, 61 L.Ed. 233.

The rights and incidents of membership in a Federal Home Loan Bank are clearly specified and limited by the Federal Home Loan Bank Act. We have previously adverted to the general status of the banks in Part three of this opinion. Membership in Home Loan Banks is available to *any* building and loan association or similar institution which can qualify under the provisions of Secs. 4 and 5 of the Act, Title 12 U.S.C.A. §§ 1424 and 1425. By these sections membership is subject to the approval of the Home Loan Bank Board; and "the board may, after hearing, remove any member from membership, * * * if, in the opinion of the board, such member * * * has failed to comply with any provision" of the Act or the Board's regulations pursuant thereto. Title 12 U.S. C.A. § 1426(i). An eligible institution may become a member only of the Federal Home Loan Bank of the district in which is located the institution's principal place of business or under some circumstances of an adjoining district. See Section 1424(b).

Each member of a Federal Home Loan Bank is *now* required by the Act to invest and keep invested in stock of the bank an amount equal to 2% of the unpaid principal of its outstanding home mortgage loans. 12 U.S.C.A. § 1426. (At the time of the issuance of the three orders here under challenge, the original stock subscription for each institution eligible to become a member was required to be an amount equal to 1 per centum of the aggregate of the unpaid principal of the subscriber's home mortgage loans, but not less than $500. Consult Section 1426(c).) The amount of capital investment required of each member is readjusted by the Board from time to time and a member may request the retirement of stock in excess of that required and the return of its excess capital. 12 U.S. C.A. § 1426(c). A member, *other than a federal association* may withdraw from membership and secure the return of the amount subscribed for stock after payment of outstanding indebtedness to the bank. 12 U.S.C.A. § 1426(i). Stock subscribed for by a member may not be hypothecated or transferred except that with the consent of the Board stock may be transferred to another member or one eligible to membership. 12 U.S.C.A. § 1426(h, j).

Transfer of membership of member associations from the Los Angeles Bank *to* the San Francisco Bank, effected by Order No. 5082 of the Commissioner did not invade, impair or violate any property right of the association co-plaintiffs in the Los Angeles Action or other association members similarly situated. Their "rights" as members of Los Angeles were carefully spelled out and limited by the law under which they must operate as *Federal* associations. And whatever statutory right a bank shareholder has to be a member of *some bank*, it acquired and has no legal right to continue its membership *in any particular bank*—when the statute vested in the Board the power to dissolve a bank, 12 U.S.C.A. § 1445, it specifically denied to members any such right. Purchase of bank stock is a condition of bank membership and does not confer proprietary interest or a property right of any kind in the bank itself. Consult Peoples Bank v. Federal Reserve Bank of San Francisco, D.C., 58 F.Supp. 25. And for the reasons we have indicated we must and do hold that association members of the former Home Loan Bank of Los Angeles had no property right or justiciable interest in the continued existence of that bank.

The power of the Board to substitute stock ownership under the conditions here shown is indispensable to the exercise of the statutory power lodged in the Board to readjust districts and to dissolve a bank. This is obvious for there must be one and only one bank to a district. 12 U.S.C.A. § 1423. Whatever right a state-chartered association has to remain a member of a bank could then, upon dissolution of the bank, be preserved only by transfer of its membership and stock ownership incident thereto to an existing bank in the district. Otherwise, dissolution would mean expulsion. Its right voluntarily to withdraw from membership in a bank remains unaffected, because that right continues to exist under exactly the same conditions as it did before the transfer. Likewise *the duty* of *Federal* associations to be and remain a member could, upon dissolution of a bank,

be *enforced* only by such *transfer* of its bank membership. Otherwise, it would cease to be a member of a bank, and such membership is mandatory, 12 U.S.C.A. § 1464(f), if an association desires to remain a *federal* association.

We think it quite · clear that whatever "rights" associations have in a Federal · Home Loan Bank must be and are defined *by* statute and these rights are not, and can not be, modified or changed by reason of the form in which the action of Los Angeles was cast. Therefore the claim of property rights, whatever the nature of these claims, must be measured solely by the law under which the banks and Federal Savings and Loan Associations have and enjoy a legal existence. Whatever legal rights and privileges inured to the benefit of association members of Los Angeles by reason of membership in that bank were rights and privileges which they continued to enjoy as members of San Francisco. The "transfer" of membership from one bank to the other in no wise changed or affected these rights. Thus the abolition of the Los Angeles Bank and its absorption by the Bank of San Francisco simply had the legal effect of transferring the "membership" of associations in Los Angeles *to* membership in the Bank of San Francisco. We have no reason to doubt or challenge the lawful existence of the Bank of San Francisco since in our view it became an integral part of, and a lawfully created Home Loan Bank within, the Federal Home Loan Bank System. As a consequence the *"transferred"* association members of the former Los Angeles Bank continued to be members of another lawfully established Federal Home Loan Bank and continued to retain such association membership privileges as are granted by and under the statutory scheme and system of which they were and are a part.

It is to be further noted that securing a *charter* from the Board to operate as a Federal Savings and Loan Association is a purely voluntary act, and it is this voluntary act which automatically makes such association a member of · a Federal Home Loan Bank, 12 U.S.C.A. § 1464'(f) enjoy-

ing only such membership privileges as the law provides.

By the readjustment of Home Loan Bank Districts Eleven and Twelve under the three challenged Board Orders of 1946, the Bank of San Francisco came into possession of the combined assets and resources of the former Los Angeles *and* Portland Banks. We do not understand that appellees and Mallonee-Association are asserting that the *financial* stability of the present Bank of San Francisco is open to challenge or that it is less capable of fully performing the assigned statutory functions of such a bank than the former Bank of Los Angeles. Nor is it contended that the Bank of San Francisco has denied or is denying customary banking services to its association members in conformance with statutory provisions relating to and governing its operations. In all such respects the limited property rights which member associations had in their shares of stock in the Los Angeles Bank were in no wise impaired by the orders in controversy since their membership rights, as defined by statute, have remained unchanged.

However, it was broadly implied in oral arguments on this appeal that the capital stock which Federal Savings and Loan Associations held in the former Bank of Los Angeles (which stock was exchanged for equivalent shares of stock in the Bank of San Francisco) has suffered a loss of value through the transfer of membership to the San Francisco Bank. The suggested "loss of value" due to this transfer is advanced to support the claim of destruction of membership "property rights" of association and other association members "similarly situated" and for whose benefit the Los Angeles Action purports to speak.

It was suggested to us that while the stock in the Home Loan Bank of Los Angeles cost its association members $100 per share, see 12 U.S.C.A. § 1426(b, c, d) the bank was "solvent" and had a "surplus" of approximately $1,900,000; that operations of Los Angeles had resulted in the shares in that Bank achieving a "true value" of $132 or thereabouts; that the "transfer" of assets and shares of stock under the three

Orders caused association members of Los Angeles to *"lose"* this added and "surplus" value of the stock amounting to $32.00 per share *because* of the (also undisclosed but implied) less desirable position or status of the present Home Loan Bank of San Francisco. A claim for recovery of this "surplus" value of its stock in the Bank of Los Angeles was formally asserted in a pleading of Association filed on or about January 12, 1948.

Subsequent to the argument on appeal counsel for appellees directed our attention to American Power & Light Co. v. Securities and Exchange Commission, 325 U.S. 385, 65 S.Ct. 1254, 89 L.Ed 1683, a case dealing with a statutory provision under which a person or party "aggrieved" by an order of the Securities and Exchange Commission may demand and secure a review of the order in a court of appeals. They say that the parallel between the case of American Power and the instant case is obvious, and they make the comparison to support the argument that had the stock of the Los Angeles Bank been "paid off and retired in whole or in part" as required by 12 U.S.C. A. § 1446, the plaintiff associations in the Los Angeles Action, as stockholders in the Los Angeles Bank, "would have received $132.51 per share for each share of stock held by them and which they purchased at a par value of $100 per share." (The figure of $132.51 is said to represent the book value of each share on March 29, 1946.)

Based on this argument it is urged that a substantial economic interest of each of these plaintiff associations was directly affected by the 1946 orders of the Commissioner (Federal Home Loan Bank Administration) as a consequence of which each of such associations was "aggrieved by such action" within the meaning of Section 10 (a) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(a) *permitting a judicial review of said orders.*

Another case asserted to be closely in point is Stark v. Wickard, 321 U.S. 288, 289–306, 64 S.Ct. 559, 88 L.Ed. 733. Appellees are of the view that these two cases "scotch one of the principal arguments advanced by appellants; namely that, neither plaintiff Bank of Los Angeles nor plaintiff

associations [in the Los Angeles Action] have any standing to sue."

For the reasons we have noted we cannot agree that these cases support the foregoing contention of appellees. As to a right of judicial review of the orders under the Administrative Procedure Act, see comments in Part 6, infra.

 We find nothing in the record or in the law which lends support to the suggestion that the capital stock of the Federal Home Loan Bank of San Francisco is less "valuable" to association members by reason of the merger of the Portland and Los Angeles Banks. Whatever the basis of this tenuous argument it lacks substance in law since it necessarily rests on the untenable concept and assumption that Federal Home Loan Banks are in truth and in substance *private corporations* and that stock in these banks held by association members falls into the same "value" and "market" category as that of a purely private corporation whose stock is the subject of free barter and trade. The difference, if any, between the amount of the "cash paid subscriptions" (cost price) and this claimed "added value" is not a "legal loss" to association members which controlling statute law recognizes and for which it will permit recoupment in an action cognizable in a federal court. A claim of "loss" of a "property right" predicated upon such an assumption is wholly without merit, and in this connection appellants point to the fact that under applicable law a withdrawing association is specifically denied the right to receive a greater sum than cost price for its surrendered stock in a Home Loan Bank. Title 12 U.S.C.A. § 1426 (b, h, i, j). There is no claim that any association members of the Los Angeles Bank paid in excess of $100 per share for stock in that bank.

For reasons heretofore expressed we are of the opinion and therefore hold that the transfer (under the three 1946 orders of "Administration") of membership of Federal Savings and Loan Associations in the former Federal Home Loan Bank of Los Angeles to membership in the Federal Home Loan Bank of San Francisco pursuant to the "readjustment" of the Home Loan Bank Districts here involved, and the

substitution of association stock ownership in the Home Loan Bank of San Francisco for equivalent stock ownership in the former Home Loan Bank of Los Angeles, did not adversely affect, impair or confiscate "property rights" represented by the association stock ownership in the former Bank of Los Angeles. We further hold that the procedure by which the aforesaid transfer of stock ownership was accomplished did not constitute an unlawful seizure, confiscation or expropriation of claimed "private property" or "property rights" represented by required membership in a Home Loan Bank.

The Federal Home Loan Bank of San Francisco is, and will continue to remain, an instrumentality of the United States until its status is changed by Congressional or Board action. It is now, and has been since its creation under administrative orders, operating for the purpose of providing (subject to the direction and control of the Home Loan Bank Board) reserve banking facilities for savings and loan associations and similar institutions within its District. 12 U.S.C.A. § 1430.

## VI

### The Problem of Judicial and Administrative Review of Board Orders

Appellees' brief (and their brief as counsel for the Home Loan Bank of Los Angeles in the main case) elaborate on the issues considered at this point. In our opinion in the main case, Home Loan Bank Board v. Mallonee, supra, 196 F.2d at pages 343 to 348, we referred at length to contentions advanced on behalf of Los Angeles in the so-called "Los Angeles Action," and the essentials of these contentions are again urged on the instant appeal. In the main case we endeavored to clearly state the basic and underlying theory of the Los Angeles Action and to that end quoted liberally from the brief of its counsel. The issues in the Los Angeles Action and the contentions of appellees presented on the instant appeal are so closely allied and interwoven

that they must be treated together if the instant bracket of the main litigation is to be properly considered. Briefs filed in the main case also assert that the conflicting claims of all parties to the entire litigation are so hopelessly intermingled as to defy separation in the various appeals now in this court, and there is enough validity to this contention to justify our effort to appraise and pass upon claims asserted by both Los Angeles and appellees on this appeal, since both of these litigants take the same position on this matter. One of such issues common to both cases involves the question of administrative and judicial review of orders which inspired the Los Angeles Action.

In the instant appeal (as in the briefs of Los Angeles in the main case) we are assured by appellees that since the lower court has jurisdiction in personam over the Home Loan Bank of San Francisco, it has and should exercise "plenary power" to adjudicate that bank a "constructive trustee" and order it to return to Los Angeles the demanded assets and properties transferred under the three administrative orders of March 29, 1946 "without in any way touching the (administrative) orders in question" —this because such action would clearly be within the powers of a court of equity in a proceeding *quasi in rem*. A decision of the California Supreme Court is cited as supporting this doctrine.[15] It is said that such relief *in personam* would be purely in aid of and *incidental* to the exercise of the court's jurisdiction *in rem* over the assets and properties themselves and two federal cases are cited as supporting this view.[16] (We have commented on this argument in part four of this opinion.)

On this appeal, and throughout all proceedings in the Los Angeles Action, it has been aggressively emphasized by its counsel that the Los Angeles Action was not brought to secure a judicial review of the actions of the Commissioner (then Administration) as evidenced by his orders. Nos. 5082, 5083 and 5084 of March 29, 1946. Appellants' contention that the Home Loan

---

15. Title Insurance & Trust Co. v. California Development Co., 171 Cal. 173, 198–199, 152 P. 542.

16. Jellenik v. Huron Copper Co., 177 U. S. 1, 20 S.Ct. 559, 44 L.Ed. 647; Harvey v. Harvey, 7 Cir., 290 F. 653.

Bank Board and its members are indispensable parties to this action and to the so-called "Los Angeles Action" is challenged as being *wholly devoid of merit*. (In passing, it should be noted that Mallonee-Association agree with this view.) [17]

If any one thing is free of doubt in this litigation it is that Los Angeles has never sought, and does not now seek a formal and orthodox "judicial review" on the question of the validity of the administrative orders of the Commissioner which in 1946 readjusted the Home Loan Bank Districts of the Pacific Coast area. The nature and theory of its action and the specific demands for relief are a complete rejection of the idea that Los Angeles relies on rules and standards of procedure applicable in cases where a litigant is demanding a formal judicial review of final administrative orders under either the Administrative Procedure Act or other statutory authority.

But despite its form of action and the basic and underlying theory of its case, Los Angeles embraces and seeks to have applied certain principles applicable to a formal judicial review. As we have previously indicated, it so far relies on a claim of right to some sort of *judicial review* of the challenged orders of the Commissioner as to urge that (at least) "the activities of the Commissioner leading up to the seizure of the demanded assets and properties (of Los Angeles Bank) are subject to judicial scrutiny." Measured against orthodox concepts in the field of administrative law and procedure we find it difficult to understand exactly what this sort of a demand may mean or imply. But the record reveals that in the proceeding below and in response to this demand for a "judicial scrutiny," the lower court did "scrutinize" and pass judgment upon the referred to "activities" of the Commissioner in much the manner prevailing in the orthodox type of judicial review of administrative orders. The end result of this indirect form of "judicial review" was a declaration that the orders were without legal force or effect so far as affecting property rights claimed by plaintiffs in the Los Angeles Action. To this extent and up to this point in the proceedings below the procedure followed has amounted in effect to a full fledged preliminary judicial review of the orders without a formal demand therefor. See footnote 21 infra. Thus we confront the anomalous but very practical fact that the Los Angeles Action has, in all essential respects, eventuated in a collateral but none the less successful attack (to the extent noted) upon the validity of the 1946 orders of the Commissioner, and this prior to the trial of the action. By this process of indirection Los Angeles has now accomplished a result which the procedure under the form of action it adopted would clearly appear to deny to it. While specifically and bluntly repudiating the theory that judicial review of the administrative orders is necessary or is the objective of its suit, Los Angeles has managed to enjoy most of the fruits of a procedure which would normally be one of the most essential elements of a formal judicial review of the orders.

However one may identify the nature of the indirect form of judicial review thus secured, it was achieved in face of assurance of the Los Angeles Bank (and appellees in the instant appeal) that under the *quasi in rem* action of Los Angeles brought to try title to assets it claims from the Bank of San Francisco, there is no necessity for the court to engage in "any species of *review* of the administrative orders." It is frankly asserted that the problem is not whether the orders should be set aside in an administrative sense but *only* whether they operated to transfer title of assets of Los Angeles to the Bank of San Francisco. This, says Los Angeles, "certainly does not call for a setting aside of the orders as in the case of an administrative review." And see further ref-

---

17. Mallonee-Association make the blunt assertion that as to the instant proceeding "there are no indispensable parties;" that "no action by appellants is necessary to effectuate the order (granting interim attorneys' fees to counsel for plaintiffs in the Los Angeles action) nor can their non-consent prevent its enforcement."

erence to this phase of the case in part four of this opinion.

In this posture of the litigation we cannot agree that the oblique and collateral attack on the validity of the Commissioner's orders which are the heart of the problem before us is permissible in either the Los Angeles Action or the instant proceeding.

But counsel for Los Angeles also justify their form of attack by pointing out that Section 26 of the Act, Title 12 U.S.C.A. § 1446, requires a "finding" that the efficient and economical accomplishment of the purposes of the Act will be aided by his (Commissioner's) action in issuing the challenged orders; that because the Commissioner made a "determination" in his order No. 5082 rather than a "finding," the orders based on this determination are open to the kind of attack made on them in the Los Angeles Action (and in the instant appeal).

It is urged by appellees that a "finding" as required by Section 26, supra, imports a hearing, based upon evidence, before any "determination" or other decision may be arrived at; that a "finding" of the existence of certain facts presupposes some hearing of evidence tending to prove such facts. As to the necessity for a hearing based on evidence prior to a formal "determination" or other decision, appellees rely on three state cases.[18] It is suggested that since the Commissioner acted without affording the Los Angeles Bank or its members any notice or hearing, this situation is "persuasive evidence" that he was unable to find from the evidence, any *facts* which would have supported his determination; that these are matters which become judicial questions open to adjudication in the Los Angeles Action.

▇▇▇ We do not agree. We think that neither the statute in question nor constitutional principles require us to hold that an administrative hearing before the Commissioner (a phase of the problem later discussed) was a prerequisite to the validity of the orders, or that his use of a formal "determination" (rather than a pronouncement or recital which he might have styled a "finding") to set forth reasons for his action in issuing Order No. 5082, serves to invalidate the Commissioner's orders. So far as concerns the end results of the orders with which we are here concerned, the Commissioner's "determination" was, in effect, a sufficient "finding" for it adequately reflected his administrative judgment and ultimate decision, and his reasons for directing the specific changes in the Home Loan Bank System which were accomplished under the orders. The "determination" expressed in the orders accomplished his announced administrative purpose to the same extent and with the same effect as though he had embodied the same or similar declaration in formal language which he styled a "finding." Certainly no one was, or could be, deceived as to his purpose to readjust a portion of the Home Loan Bank System to the extent and in the manner indicated in the orders; the language of the orders makes clear the fact that they abolished the Bank of Los Angeles and readjusted the Western Bank Districts, a circumstance which controls and which alone inspired the Los Angeles Action.

▇▇▇ We agree with appellants that a so-called "finding" would, in the very nature of the duties imposed upon the Commissioner, be only a prophecy with respect to future operations of Home Loan Bank System in the Pacific Coast area; and we further agree with appellants that the decision of the kind reached by the Commissioner wherein he "determined" that the efficient and economical accomplishment of the purposes of the Federal Loan Bank Act would be aided by his action in issuing the three challenged orders was in sufficient compliance with the requirements of Section 26, supra. We also agree with appellants that the "determination" was a decision of a kind with which the judiciary should not be concerned, for courts have neither the aptitude nor facilities to weigh

18. Abrams v. Daugherty, 60 Cal.App. 297, 302, 212 P. 942; California Employment Commission v. Malm, 59 Cal.App.2d 322, 324, 138 P.2d 744; Mt. Carmel Public Utility & Service Co. v. Public Utilities Commission, 297 Ill. 303, 130 N.E. 693, 696, 21 A.L.R. 571.

the need for such orders which in our view belong in the domain of political power and are therefore not subject to judicial intrusion or inquiry. Decisions upon which such orders rested are delicate and complex, and necessarily involve large elements of prophecy and to that extent are akin to the decisions discussed in Chicago & Southern Air Lines, Inc., v. Waterman S.S. Corporation, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568. Cf. Chicago, B. & Q. R. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 51 L.Ed. 636.

We have to confront the fact that Congress created its own administrative agency to weigh all phases of the complex problems arising in the operation of the Home Loan Bank System and vested it with authority to use its discretion in ultimately determining in some formal manner the most suitable and desirable solution for specific problems one of which might be a readjustment of bank districts. The general language of Section 26, supra, does not justify us in holding that had the Commissioner issued and adopted a statement which he called "finding" rather than a declaration in which he "determined," this ultimate conclusion on what he desired to accomplish would to that extent have validated his orders. We are dealing with practical matters and not mere technicalities and we are unable to see in the technical distinctions here drawn the force and persuasiveness attributed to them by Los Angeles and appellees. They fall far short of sustaining the specific challenge on this point.

But Los Angeles and appellees broaden their attack on the mode of procedure adopted by the Commissioner. It is urged that the procedure he employed in exercising his wide discretionary powers respecting the readjustment of bank districts under the conditions shown by the record, reveals such an abuse of the Commissioner's administrative authority as to require the lower court to substitute its judgment on administrative matters here considered for that of the Commissioner, and by its decree strip his orders of force and validity;

that despite the provisions of Section 26, supra, the lower court has plenary power to do this regardless of the wide discretion vested in the Commissioner (now Board) to readjust bank districts and the broad and general statutory authority for such action.

The specific contention is that where a particular *mode* of exercising a power is conferred by law, the *mode* is the measure of the power. Appellees rely upon two state cases as authority for this principle.[19] These are California cases which deny power to a local school board and a county purchasing agent to contract (on behalf of local political subdivisions) for construction work on a school building, or to purchase cement for the county, without strictly conforming to express provisions of State law requiring a prior call for bids to do such work or furnish such supplies, and a later award of a formal contract to the lowest responsible private bidder. We cannot agree that restrictive provisions of State law which control execution of contracts for public construction work and supplies to be provided by private contractors in the field of public work contracts where a "general power to contract" on behalf of public agencies was specifically denied by statute to the local officials involved, lend support to the above noted contentions of appellees. In this litigation we are dealing with an entirely different legal situation.

It will not do to say that the administrative orders here considered possess the same legal significance as attempted purchases by minor local officials which are outlawed under State statutes because they are in defiance of specific requirements for a call for bids from private contractors and an award of a contract under the conditions we have noted. The drastic restriction imposed on the contracting powers of minor local officials under State law is not a yardstick by which we may safely measure the wide discretionary powers vested in the Board by Congress. The addition of charges of bad faith and malice on the part of the Commissioner will not serve to place

19. Reams v. Cooley, 171 Cal. 150, 152 P. 293; Cowell Lime & Cement Co. v. Williams, 182 Cal. 691, 180 P. 838.

his orders in the same category as the State cases cited by appellees. We cannot agree that the rationale of these California cases supports appellees' contention concerning the invalidity of the Commissioner's mode of procedure. Views we expressed in Part three herein add emphasis to our reasons for rejecting the argument of Los Angeles and appellees in their criticism of the mode of procedure adopted by the Commissioner.

A further contention concerning the mode of procedure employed by the Commissioner is presented. It is said that the "judicial scrutiny" sought by Los Angeles requires consideration and disposition of its charge that the orders did not provide that the Commissioner should pay off and retire the stock of the bank, in whole or in part; that such a procedure was not followed; that in this important regard the orders did not conform to the procedure prescribed in Section 26, supra. Appellees say that "granting the power to liquidate *or* reorganize, the procedure therefor is set forth in the statute and must be followed." To support this view they rely on Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093, a case in which rates chargeable by the telephone company for intra-state telephone service to subscribers and patrons in Ohio were the subject matter of the controversy and involved repayment to consumers of some portion of an increased rate. We think that the doctrine announced in the cited case fails to support the theory urged by appellees.

For reasons heretofore set forth at length, Los Angeles is predicating its argument on the assumption that when it was abolished by the readjustment of the Home Loan Bank Districts, the property in its possession which was transferred to the Bank of San Francisco, had to be disposed of in some manner in order to "pay off and retire the stock of the bank, in whole or in part;" that this process had to be accomplished much after the manner employed in liquidating a wholly solvent private banking corporation voluntarily going out of business—this so far as concerns the claimed "property rights" and stock interests of association members of the bank. In other words, the stock of these members must be "retired" by purchase in order to legalize the transaction.

■ We do not agree that the provisions of Section 26, supra, were violated by the process followed by the Commissioner. This section provides that whenever the Board finds that the efficient and economical accomplishment of the purposes of this chapter will be aided by such action, *and in accordance with such rules*, regulations, and *orders as the Board may prescribe*, "any Federal Home Loan Bank may be liquidated or reorganized, and its stock paid off and retired in whole or in part in connection therewith after * * * making provision for the payment of its liabilities. * * * [and] any other Federal Home Loan Bank may, with the approval of the board, acquire assets of any such liquidated or reorganized bank and assume liabilities thereof, in whole or in part."

These general provisions must be read against the whole background of the Act which reflects the policy of Congress to have the Board discharge functions which, though legislative in character, were delegated to the Board. These provisions speak the purpose of Congress to maintain at all times a plenary control over the Home Loan Bank System, and to exercise this control through its own administrative agency. In light of such a clear purpose we think that courts may not subject discretionary Board changes in the system to judicial revision or review since this would substitute court determinations for those which Congress intended should be made by the Board.[20] Such a process would call upon courts to weigh all factors involved in such changes which in turn would involve the courts in a process leading to serious interference with the public administration of the system.

---

20. Red River Broadcasting Co. v. Federal Communications Comm., 69 App.D.C. 1, 98 F.2d 282, 287. See Marshall v. Pletz, 317 U.S. 383, 388, 63 S.Ct. 284, 87 L.Ed. 348; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 444, 50 S.Ct. 220, 74 L.Ed. 524.

Since the Bank of Portland was abolished, i.e., dissolved, (see Title 12 U.S.C.A. §§ 1423 and 1445, we look to the Commissioner's order No. 5082 (see footnote 5 of our opinion in the main case for text of this order, 196 F.2d 343) to ascertain just what was done to "reorganize *any* bank in accordance with such * * * orders as the Board may prescribe." Without repeating the whole text of the order it is sufficient to say that (among other matters not here material) it liquidates and reorganizes the Bank of Los Angeles; transfers assets in possession of that bank to the Bank of Portland; directs that all liabilities of Los Angeles Bank are to be assumed by the Bank of Portland, which are, by the order in question, made the obligations of the Portland Bank; directs that all members of the Bank of Los Angeles "are to become members of the Federal Home Loan Bank of Portland" (which the order states is to thereafter be called the Federal Home Loan Bank of San Francisco); orders and directs the Bank of San Francisco to issue appropriate evidences of the ownership of all of the stock formerly held by the Federal Home Loan Bank of Los Angeles including stock purchased and held on behalf of the United States Government. (This would include the issuances of "evidences of ownership of stock" in the San Francisco Bank to association members of the former Los Angeles Bank. And see comments in part five of this opinion on "property rights" associated with membership in a Federal Home Loan Bank.) The charter of the Los Angeles Bank was cancelled and the Bank of Portland was moved to the city of San Francisco.

We do not doubt the authority of the Commissioner to make and enforce the order containing these directives.

It is said that the Los Angeles assets were *thrust* upon the Portland Bank without any affirmative corporate action whatever by either bank. The Home Loan Bank Act is not cited in connection with this statement; that Act does not require such action by either of these banks and the contention is without merit.

It is said that "under general principles of jurisprudence" the right of appeal to the courts in a case of administrative action of an arbitrary or capricious nature which, as here, *directly affects property rights*, is established. To support argument appellees rely on Markall v. Bowles, D.C., 58 F.Supp. 463, a case in which the court states that the single question presented is whether an order suspending the plaintiff's gasoline ration for "so long as gasoline shall be rationed" is so far beyond the necessities of the case and so irrelevant to the rationale of rationing as to be capricious and arbitrary and therefore subject to judicial correction as an abuse of power. It is urged that "under such circumstances" (where arbitrary or capricious action is charged as in the Markall case) "Federal courts will read the requirements of due process into the Act, and due process means a hearing; therefore, a hearing is an integral part of the Federal Home Loan Bank Act, just as much as if the Act itself in words stated that a hearing should be held." In support of this theory appellees cite Eisler v. Clark, D.C., 77 F.Supp. 610, a case dealing with the deportation proceedings against Eisler and involving application of the Administrative Procedure Act to such proceedings. But see Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 145, 57 S.Ct. 407, 81 L.Ed. 562, for discussion of problem where improper motives are charged as basis for promulgating orders.

As to a "hearing" it is urged that in the case of the Los Angeles Bank the Commissioner *ordained* in an official *fiat* that the assets *lawfully owned or possessed by the Los Angeles Bank* should be transferred to the Portland Bank which ordainment *impinged upon the property rights* of both the Los Angeles Bank and its association members; that under these circumstances the argument that *property rights* of the bank and these members were not affected by the seizure, wholly fails to stand scrutiny because it is a basic principle "that due process requirements are satisfied if, and only if, at any time before governmental action *with reference to property rights* becomes final, *hearings* are allowed either by administrative or by judicial action."

That appellees (speaking also in behalf of Los Angeles Bank) seem to be referring to and demanding the orthodox type of administrative hearing is suggested in the argument that "the test seems to be this: That if an administrative agency merely *advises*, a hearing in the due process sense may not necessarily be required; but where, as here, the agency *ordains*, in such a manner *as to impinge upon property rights*, a due process (which means a full and fair) hearing is required *at the administrative level* in order to facilitate attendant judicial review." Six cases are cited to support this contention.[21] It will be observed that this doctrine is applied to a situation where action of the administrative agency *impinged upon property rights*. Since a hearing was not held "at the administrative level" it is further urged that the Bank of Los Angeles is "entitled, under the Fifth Amendment, to such a hearing *now* when the matter is pending before a court."[22] In connection with this argument it is not contended that a demand or request was ever made on the Commissioner or the Board for any sort of a "hearing," informal or otherwise. The Los Angeles Action was instituted without the formality of such a demand. And see footnotes 8 and 22 supra.

In Part three of this opinion we held that Federal Home Loan Banks are not "private property" of their member-stockholders but are banking agencies and instrumentalities of the federal government as a consequence of which the "determination" of the Commissioner in the orders of March 29, 1946, did not, and could not, have "impinged up-on, confiscated or adversely affected property rights" of Los Angeles Bank and its association members.

Appellees remove some of the obscurities concerning the precise type of "hearing" they are demanding when referring to "a hearing now" by saying that *this means* that the district court is empowered, as a matter of due process of law, to *scrutinize* the activities of the Commissioner here complained of, *in addition to* its plenary jurisdiction in equity to adjudicate title and the right to possesion to the assets and properties over which it has acquired jurisdiction, and that *this argument* should dispose of the contention that the activities of the Commissioner are not subject to judicial review. They urge that in the eyes of equity no adequate remedy at law has been provided for the protection of the *property rights* of the plaintiffs in the Los Angeles Action against arbitrary action which is a valid ground of equity jurisdiction.

It is said that *to the extent* that the "scrutiny" of the court below in this quiet title and possessory action of Los Angeles is devoted to a consideration of the *validity* of the three orders to pass title or a right to possession as regards the Los Angeles Bank assets, the impact of the action upon the orders in question is certainly not collateral but is direct and immediate. We do not agree with this conclusion. It is amplified by the further contention that the *jurisdiction* in these actions involving the Bank of Los Angeles springs, not from any review power as such, but the plenary power

21. Siegel v. United States, D.C., 87 F. Supp. 555; Interstate Commerce Comm. v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 318–319, 53 S.Ct. 350, 77 L.Ed. 796; Dismuke v. United States, 297 U. S. 167, 169, 56 S.Ct. 400, 80 L.Ed. 561; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

22 In the prayer of the complaint in the Los Angeles Action no demand is made that the court order, or attempt to order, an administrative hearing by the Commissioner on his three challenged orders. For prayer of complaint see pp. 9493 to 9496 printed transcript in appeal No. 12,511. See also prayer of cross-claim of Los Angeles pp. 583 to 586 of printed transcript in appeal No. 12,511. It is upon arguments of the character here noted that Los Angeles bases the claim that as a matter of due process the lower court "is empowered * * * to scrutinize the activities of the Commissioner here complained of, *in addition* to its plenary jurisdiction to adjudicate title and the right to possession to the assets and properties over which it has acquired jurisdiction." And see further comments in footnote 8, supra, concerning prayers for relief set forth in the pleadings of Los Angeles Bank.

of a court of equity to try title, remove clouds, adjudicate the rights to possession and enjoin the assertion of unfounded claims. The basic position of Los Angeles is thus made plain.

Referring to appellants' suggestion that the action of the Commissioner in abolishing the Los Angeles Bank and transferring its assets to the Bank of San Francisco was quasi-legislative in nature, appellees aver that an agency exercising quasi-legislative functions has no more power *to deprive a person of property* without due process of law than has anyone else, citing Londoner v. City and County of Denver, 210 U.S. 373, 385–386, 28 S.Ct. 708, 52 L. Ed. 1103; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093; Interstate Commerce Comm. v. Louisville & Nashville R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431. It is asserted that the Commissioner was acting administratively insofar as he stayed within the framework of the Act; that when he exceeded his *statutory authority,* as charged by Los Angeles, he became a mere tort-feasor whose purported transfer of the assets to the San Francisco Bank did not and could not operate to vest ownership in that bank; that whether he did or did not act in derogation of his statutory powers is the question to be tried below; that under the doctrine of Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209, and United States v. Lee, 106 U.S. 196, 1 S. Ct. 240, 27 L.Ed. 171, the question of the *jurisdiction* of the district court in the Los Angeles Action may only be determined after a trial on the merits.

A case thought by appellants to have relevancy on the question of the Commissioner's authority is United States v. George S. Bush & Co., 310 U.S. 371, 380, 60 S.Ct. 944, 946, 84 L.Ed. 1259, where it is stated as a general principle that "it has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review"—that "Whenever a statute gives a discretionary power to any person, to be ex-

ercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."

See also Williamsport Wire Rope Co. v. United States, 277 U.S. 551, 561, 48 S.Ct. 587, 589, 72 L.Ed. 985, which refers to a situation where the facts on which action must be taken "can only be known to an official or a body having wide experience in such matters and ready access to the means of information." We think that the rationale of the Bush and Williamsport cases may be applied to the administrative "determination" of the Commissioner which is here under the challenge of invalidity.

While we later discuss the relation of the Administrative Procedure Act of 1946 to, and its effect upon, an issue of this character, it is sufficient to point out that Congress has carefully refrained from writing into the Act a provision requiring the holding of Board hearings on final administrative orders even when such a hearing may be demanded or requested, and this omission is too significant to be overlooked or disregarded. For this court to now hold that a requirement for such hearings on orders of the character here involved must be read into the Act "as an integral part" of the legislation because such orders are *charged* with being the product of arbitrary and capricious impulses and motivated by malice, we would be inserting a requirement in that Act which is not only conspicuous by its absence but the insertion of which would amount to judicial amendment of language which speaks the continued legislative will and policy of Congress in a manner too plain to be misunderstood.

For the reasons stated below we must and do assume that had Congress intended that the Board should grant administrative hearings on final orders when a demand is made therefor, it would have clearly indicated such an intent in the language used. Counsel have not called to our attention any case involving problems associated with Home Loan Bank operations which hold to the contrary or call for a different conclusion.

All of the foregoing arguments of appellees get back to and are squarely found-

ed upon the claim that "property rights" of association members of Los Angeles Bank were expropriated by administrative action when the bank was abolished and their membership transferred to the Bank of San Francisco. The contentions serve to emphasize the basic and controlling theory of this litigation that the *continued existence* of the Bank of Los Angeles was "a legally protected property right," and that in abolishing it by his orders, the Commissioner "and his confederates" were nothing other than tort-feasors. It is said that by reason of these orders the Commissioner was guilty of "spoliation," and that the case made on the pleadings by Los Angeles "falls precisely within the pattern of such cases as United States v. Lee, supra, and Land v. Dollar, supra," because the Los Angeles Action is a case where "the right to the possession or enjoyment of [private] property under general law is in issue."

We cannot agree that the Land and Lee cases are decisive of the most vital issue in the Los Angeles Action—the legal status of the Los Angeles Bank and its association members, or that the doctrine of these cases is controlling or is applicable to the situation revealed in the Los Angeles Action. In parts three and five of this opinion we have made plain the reason why we disagree on this point with Los Angeles and its counsel both in the main case and on this appeal.

Obviously the important phase of the case presented in the foregoing summary of appellees' arguments concerning the claims and the legal status of the Home Loan Bank of Los Angeles relates directly to the bank's contention that the real and decisive question is whether the three 1946 orders of the Commissioner did or did not operate to pass the right to possession of the disputed assets from the Los Angeles Bank to the San Francisco Bank. We agree with appellees that this issue is in every phase of the Los Angeles Action.

And as to this vital question appellees assert that Land v. Dollar, supra, and its companion cases *are direct authority* for the proposition *that this question* can only be decided on the merits—*that this means that the Los Angeles Action must be tried.*

Because we do not agree with this conclusion we have held that the Los Angeles Action must be dismissed for want of jurisdiction in the lower court to entertain it.

The final aspect of the problem here considered is whether a *judicial review* of final Board orders is permissible or required in the present state of the law. The Federal Home Loan Bank Act does not provide for judicial review of such orders and Los Angeles agrees that if such a right of review is available it must be under principles established by the courts. Federal courts have never been called upon to consider this particular issue and unfortunately the run of the mill cases dealing specifically with the problem of judicial review of administrative orders shed little light on the unusual problem presented in this litigation.

■ We have been urged to hold that the Administrative Procedure Act, 5 U.S. C.A. § 1001 et seq. (hereafter referred to as APA) comes into play in the Los Angeles Action despite the assurance of Los Angeles that formal judicial review of the challenged orders is not sought. Under this Act the right of review it grants runs to "Any person suffering *legal wrong* because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute". We have previously made plain our view that as a matter of law the plaintiffs in the Los Angeles Action were not deprived of a "legal right" or suffererd a "legal wrong" by the abolition of the Home Loan Bank of Los Angeles and the creation of the Home Loan Bank of San Francisco. Therefore these plaintiffs, and those similarly situated and for whom this class action was purportedly brought, were not "adversely affected or aggrieved" in contemplation of law or "within the meaning of any relevant statute". And certainly the "relevant statute" referred to is and must be the Federal Home Loan Bank Act.

■ Any consideration of the problem posed in the Los Angeles Action must be weighed against the fact that even if the APA was applicable, it would be necessary that the judicial review of final administrative orders be conducted before a court having jurisdiction in personam over indispensable parties to a proceeding which

was initiated to test the validity of the orders of such parties. It cannot be doubted that members of the administrative board or authority would, by any acceptable test, be indispensable parties in such a judicial review, and the reviewing court would have to have jurisdiction in personam over them to make its judgment or decree effective.[23] In the absence of such jurisdiction any judgment or decree purporting to pass upon and determine the *validity* of the orders under review would be a nullity.

At the conclusion of Part four we held that in the Los Angeles Action the lower court did not have jurisdiction in personam over the Commissioner and does not have jurisdiction in personam over the present Board; also that the lower court was without jurisdiction of the subject matter of the Los Angeles Action and was and is without jurisdiction in personam over indispensable parties in and to such an action. Based on these conclusions we are of the view and therefore hold that the lower court was without jurisdiction to entertain the Los Angeles Action.

The APA occupies a position of great importance. When Congress enacted this legislation in 1946 it had before it the vitally important pattern of legislation under which the nation-wide Federal Home Loan Bank System was operating and we must credit our national legislature with a full understanding of the exact character and extent of the sweeping administrative controls this legislation was then imposing upon Federal Home Loan Banks. Obviously Congress did not then think it necessary or desirable to amend the Federal Home Loan Bank Act to bring final administrative orders of the Board within the orbit of the APA and subject them to judicial review under the provisions of the latter Act. Nor has Congress since amended the Home Loan Bank Act to provide for such a review. The simplest kind of an amendment would have achieved such a result. The only permissible inference or

implication is that Congress desired to retain in all its vigor the system of administrative control through its own agency which it had set up in 1932. Under the circumstances presented by the record we think that this inference is inescapable and should be controlling. This view is further fortified by the fact that Congress had before it on July 25, 1946, a report of a House Committee inspired by the very litigation now before us, and this report recommended amendments to the Federal Home Loan Bank Act which would have drastically limited the wide powers of regulation and control vested in the Board. (A second Congressional Committee hearing was recently concluded.)

This Committee report became available to Congress a little over one month after the approval (on June 11, 1946) of the APA and at a time when the problem of judicial review of administrative orders was agressively to the front as a subject of this far reaching legislation. The opening provision of Section 10 of the APA with its reference to "any person suffering legal wrong because of any agency action" or "adversely affected or aggrieved by such action within the meaning of any relevant statute," was a pungent reminder to legislators that (as to the extensive litigation before us) if there was grave possibility that a "legal wrong" had occurred in the enforcement of the Commissioner's orders under the bank act, or that the complaining parties in this particular litigation had been "adversely affected or aggrieved * * within the meaning of any *relevant* statute," Congress should then legislatively curb what the 1946 sub-committee had criticized as an abuse of administrative authority. Six years have elapsed since that report was made and the basic bank law retains the provisions under attack. The fact that Congress has made no changes in the law to conform to the recommendations of the 1946 committee report would seem to add considerable weight to appellants'

23. Gnerich v. Rutter, 265 U.S. 388, 391–393, 44 S.Ct. 532, 68 L.Ed. 1068; Webster v. Fall, 266 U.S. 507, 510–511, 45 S.Ct. 148, 69 L.Ed. 411; Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95; Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410; Daggs v. Klein, 9 Cir., 169 F.2d 174; Queens County Group of Savings & Loan Associations v. Home Loan Bank Board, D.C., 104 F.Supp. 396, and same case in D.C., 106 F.Supp. 504; Mouton v. United States, D.C., 106 F.Supp. 336. And see cases cited in footnote 7, supra.

contentions that the real problem in the Los Angeles Action is legislative policy rather than judicial action.

We take judicial notice of the prolonged campaign to secure passage of the APA and the fact that few pieces of legislation passed in recent years received more attention at the hands of Congress. During its consideration the entire field of administration procedure and judicial review of administrative orders was subjected to searching scrutiny in order to develop a more orderly pattern in this area of law, and it is inconceivable that Congress overlooked the Federal Home Loan Bank Act since it was an outstanding example of highly centralized and very thorough administrative control over the affairs of Federal Home Loan Banks. But it carefully refrained from interference with these tight controls which were spelled out with great clarity and certainty, and courts should not feel free to overlook or minimize the significance of the continuing refusal of Congress to amend the Home Loan Bank Act (or its seeming indifference to demands for changes in the law) after complaints had been so thoroughly and vigorously publicized through official channels. It is also a notable fact that during the many years the Federal Home Loan Bank Act has been on the books it has not inspired litigation of the character of the instant case or that considered in our opinion No. 12,511.

## VII

### The Award of Attorneys' Fees

We turn now to the specific issue of the propriety and legality of the award in interim attorneys' fees to counsel for the Home Loan Bank of Los Angeles prior to trial of the Los Angeles action. Appellees base their claim to such fees upon services rendered in the prosecution of the Los Angeles Action which was brought to resist enforcement of the Commissioner's administrative orders of 1946. The right of recovery is predicated upon the theory that this action was instituted in good faith and on reasonable grounds, and that the lower court had jurisdiction to entertain the Los Angeles Action and to adjudicate all of the claims asserted in the complaint of the Los Angeles Bank.

Appellants contend, and we agree, that the impound of the funds referred to and described in footnote 4 grew out of interpleader or intervention proceedings as to each of which several separate and distinct claims are asserted: All of the funds now in the registry of the lower court were created in proceedings in the so-called "Mallonee Case" and relate to the affairs of Association. None of the legal services described in the order appealed from was performed in connection with any of the interpleaders or interventions in which the deposits were made. And in none of the proceedings which resulted in the deposits in Court has the Los Angeles Bank asserted any claim for attorneys' fees.

To invade the funds deposited in the registry of the Court to pay counsel for Los Angeles Bank would, in our judgment, be an unlawful invasion of the property rights of the Bank of San Francisco represented by its "lien rights" against this fund based on the notes of Association executed in its favor by Ammann during his valid tenure as conservator of Association. Certainly the effect of the order here appealed from operates to reduce the funds held in court which are security for a valid indebtedness due the San Francisco Bank—since there are no general funds in this deposit the effect of the order is to require payment out of funds previously, by the court's own order, set aside as substituted collateral securing the obligations owed to the San Francisco Bank. As appellants point out, the order further specifically insures that the resulting impairment of collateral shall never be cured.

It would also seem that the effects of the order of the court would or might also impose payment of the challenged attorneys' fees upon the Federal Savings and Loan Insurance Corporation which became deeply involved in the litigation, a problem not before us on this appeal.

Claim to the award of attorneys' fees herein appealed from does not rest upon any basis of special contract or statutory authorization, and such a basis is not suggested. In any event, we are persuaded that award of attorneys' fees would only be allowable to the "prevailing party" after a trial on the merits—a problem now out of the case. If the lower court was without

jurisdiction of the Los Angeles Action the order awarding attorneys' fees cannot on any theory be affirmed. See Dubil v. Rayford Camp & Co., 9 Cir., 184 F.2d 899, 902; Vicksburg, S. & P. Ry. Co. v. Nattin, D.C., 54 F.2d 712. Nor can the doctrine of law of the case or res judicata eliminate a necessary consideration and determination of the basic jurisdictional question underlying the Los Angeles Action. For the first time since the beginning of the litigation described in our opinion in the main case this issue is squarely before this court and it may not and should not be avoided since it reaches to the heart of the problem before us.

Appellees have indicated that the vital question is whether the Commissioner's 1946 orders "pass title to the demanded assets." We think that the Bank of San Francisco is lawfully in possession of the disputed assets and that it is not holding them as a "constructive trustee" for the Bank of Los Angeles. It is also our view that unless and until Los Angeles Bank prevailed and recovered the assets formerly held by that Bank, it has neither created nor preserved a fund out of which attorneys' fees may be paid.

Appellees assure us that in awards of the type here under discussion, ultimate success or failure in the litigation is a false quantity. Their argument is that "the test * * * [is] * * * whether the litigation was conducted in good faith and on reasonable grounds." The case of Pacific States Savings & Loan Co. v. Hise, 25 Cal.2d 822, 155 P.2d 809, 158 A.L.R. 955, is cited as sustaining the propriety and validity of the interim award to appellees in the instant case. Another case said to be "squarely in point" is Eggert v. Pacific States Savings & Loan Co., 53 Cal.App.2d 554, 127 P.2d 999.

In both cases Hise, as Building and Loan Commissioner of the State of California, was dealing with the affairs of the privately owned and conducted Pacific States Savings and Loan Company of that State. The decisions seem to indicate that this private institution had become involved in financial difficulties during the depression period as a result of which Hise, under provisions of the "California Building and Loan Act" took possession of the business and assets of Pacific and placed a custodian in charge. Institutions of the character of Pacific were required to conduct their business in conformance with this Act, and the so-called "seizure" by Hise was made under provisions of the Act.

We cannot agree that either of these cases, and particularly the Eggert case, present a situation "wholly analogous" or at all analogous to that presented in the case of Los Angeles Bank. They concern state regulation of privately owned savings and loan associations and involve problems wholly associated with and peculiar to that type of state regulation. They deal with situations and announce principles of law which we think are wholly unrelated to and therefore not applicable to controlling issues posed in the Los Angeles Action or in the instant appeal. We therefore reject them as authority which would sustain the contentions of appellees. Certainly the system of state regulation of private savings and loan associations which is involved in the noted cases is not the counterpart of the federal legislation with which we are concerned, nor do cases dealing with such a state system supply a rule which could be binding upon Federal courts, or even be persuasive, when dealing with and construing the entirely different type of legislation which set up the elaborate system of administrative control applied to banks which are instrumentalities of the Federal government.

We have examined other authorities cited by appellees thought to support their demand for affirmance of the order of award here on appeal, and think they are without merit.

For reasons set forth in this opinion the order of the lower court here on appeal which awards attorneys' fees to appellees is reversed. The validity of the claim for such fees is sustainable only on the theory that the lower court had jurisdiction in personam over indispensable parties to the Los Angeles Action and jurisdiction of the subject matter of that action. We have previously held that the court did not have such jurisdiction and we therefore remand the case before us with directions to the lower court to dismiss the Los Angeles Action.